# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 23, 2025 Session

## STATE OF TENNESSEE v. JUSTIN DAVID WHALEY

**Appeal from the Criminal Court for Hamilton County**
**No. 306929   Boyd M. Patterson, Judge[1]**

_____

**No. E2024-00387-CCA-R3-CD**

_____


A Hamilton County Criminal Court Jury convicted Defendant, Justin David Whaley, of vehicular homicide by intoxication, reckless driving, driving under the influence of an intoxicant ("DUI"), reckless vehicular homicide, and multiple driving-related misdemeanor offenses, and the trial court merged the convictions into one conviction for vehicular homicide by intoxication and sentenced Defendant to nine years' incarceration. Defendant appealed, and while his direct appeal was pending, he filed a petition for writ of error coram nobis based on newly discovered evidence. Following a hearing, the trial court granted coram nobis relief in part, vacating Defendant's convictions for vehicular homicide by intoxication and DUI but denying relief as to Defendant's remaining convictions. Both Defendant and the State appealed the trial court's coram nobis order, and this court consolidated Defendant's direct appeal with both parties' appeals of the trial court's coram nobis order. On appeal, Defendant challenges: (1) the sufficiency of the evidence for his convictions for vehicular homicide and DUI; (2) the denial of his motion to suppress evidence obtained by a search warrant for a blood draw; (3) the admission of the results of the analysis of his blood sample and the retrograde extrapolation as unreliable; (4) the admission of testimony of a Tennessee Department of Transportation ("TDOT") employee as improper lay opinion; (5) the trial court's decision to allow the jury to visit the scene; and (6) the jury instructions on mistake of fact and reckless vehicular homicide. Defendant also contends that the cumulative effect of the errors at trial warrants relief and that the trial court erred in failing to grant coram nobis relief for all his convictions. In its cross-appeal, the State asserts that the trial court erred by granting partial coram nobis relief. Upon review, we reverse the trial court's order granting coram nobis relief for Defendant's convictions of vehicular homicide by intoxication and DUI, and we reinstate those convictions. Because the trial court only imposed sentences for the vehicular homicide by intoxication conviction, we remand for a sentencing hearing for the remaining convictions

---

[1] Judge Barry A. Steelman presided over a portion of the pretrial proceedings before entering an order of recusal. Judge Patterson presided over the remaining pretrial proceedings, the trial, and the post-trial proceedings.

and the entry of corrected judgments reflecting separate sentences for each conviction. We otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Reversed in Part; Remanded**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Lee Davis and Bryan H. Hoss, Chattanooga, Tennessee, for the appellant, Justin David Whaley.

Jonathan Skrmetti, Attorney General and Reporter; Caroline Weldon, Assistant Attorney General; Coty Wamp, District Attorney General; and Parker Garrett and Brian Finley, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural History**

At approximately 5:39 a.m. on the morning of July 3, 2018, Defendant struck a vehicle driven by the victim, James Patrick Brumlow, head on while Defendant was driving down the wrong side of a highway in Hamilton County. Prior to the crash, Defendant made a U-turn in the middle of the highway and began driving northbound in one of two southbound lanes. As Defendant approached the victim's vehicle in the outer southbound lane, Defendant swerved into the victim's lane and toward the outside shoulder of the highway, striking the victim's vehicle head on. The victim died as a result of injuries sustained from the crash. Defendant was subsequently indicted for vehicular homicide by intoxication, reckless driving, unlawfully driving on a divided highway, failure to yield, failure to maintain the proper lane, speeding, failure to exercise due care, DUI, DUI per se, and reckless vehicular homicide. The case proceeded to trial in October 2023.

I. Trial

*A. State's Proof*

Defendant spent the night prior to the crash at the home of David Taylor on Bakewell Mountain. Mr. Taylor testified that they planned to have a tasting of several brands of bourbon that Mr. Taylor had purchased while touring distilleries in Kentucky. Defendant arrived at Mr. Taylor's home at approximately 9:00 p.m. on July 2, 2018, and

he intended to stay the night at Mr. Taylor's home because they would be drinking alcohol and Mr. Taylor lived in an area that was not easily accessible by a cab or a rideshare vehicle.

Mr. Taylor testified that he and Defendant began drinking bourbon shortly after Defendant arrived. They each had six drinks from six different bottles of bourbon, with each drink containing more than one shot but less than two shots of bourbon over ice in a rocks glass. Mr. Taylor said they sipped their drinks throughout the night because the object was to taste the different bourbons and not to become intoxicated. They also ate snacks, such as cheese and crackers. They stopped drinking shortly before 1:00 a.m. Mr. Taylor did not believe Defendant was intoxicated or otherwise impaired due to the alcohol. Mr. Taylor said Defendant did not have slurred speech, was not unsteady on his feet, and did not otherwise lose control of his faculties.

After Mr. Taylor and Defendant stopped drinking, Mr. Taylor went to bed, and Defendant slept on the couch. Defendant was not there when Mr. Taylor woke up around 7:00 a.m. Mr. Taylor expressed surprise that Defendant had left early, explaining that they had chosen the night for the bourbon tasting because he understood that Defendant did not have to be at work at a particular time the following day. Defendant's wife later called Mr. Taylor and informed him of the crash.

Greg Green lived approximately ten minutes away from an area where the southbound lanes of Highway 27 and Highway 111 merge, which witnesses referred to at trial as an "interchange." He testified that he left his home to go to the gym at approximately 5:25 a.m. on the morning of July 3, 2018. He traveled southbound on Highway 27 to the interchange where he saw a vehicle traveling northbound on Highway 111 in the far southbound lane. It was dark outside, and there was no lighting at the interchange, but the vehicle's headlights were activated. Mr. Green observed the vehicle for a "few seconds" before the vehicle passed by him. Although Mr. Green was concerned, his cell phone was in his gym bag in the trunk of his vehicle, and he was unable to call 911. Mr. Green said he drove that route daily and had never observed a vehicle traveling the wrong way up Highway 111.

Defendant called 911 following the crash and reported that "[s]omehow, I don't know how . . . I ended up on the wrong lane and I hit them." He stated that he had worked previously as a paramedic for Hamilton County Emergency Medical Services ("HCEMS") and that the person in the other vehicle would need to be extricated. Defendant said:

> I was on the 111 and somehow, I don't know how, I ended up on the—when I was on the 27 and I went to get on the 111—and I don't know how I—I don't know if I just wasn't paying attention . . . because it's so early in the morning, but I ended upon the wrong side of the road[.]

- 3 -

He affirmed that he collided with the other vehicle head on and that he was uninjured other than a minor injury to his wrist from the air bag. He told the operator that he was returning home from a friend's house where he had stayed the night because "we were drinking last night, but I slept over till I was a hundred percent sober." He stated, "I just went down[,] and I missed the exit to the 111 coming northbound, so I went down to the bridge right before the Soddy bridge and spun around and came back. . . . Yeah, it's my fault." Defendant remained on the line with the 911 operator until officers arrived at the scene.

Jerry Workman, an investigator with the Soddy Daisy Police Department ("SDPD") at the time of the crash, was called to the scene approximately one hour following the crash. As he began photographing the scene, he walked past Defendant and asked him how he was doing, and Defendant replied, "I screwed up." Investigator Workman testified that he did not smell any alcohol on Defendant at that time. Investigator Workman explained that it did not "register" with him that Defendant was involved in the crash. Rather, Investigator Workman believed Defendant, whom he recognized as a paramedic, was at the scene to render aid.

Investigator Workman testified that the point of impact occurred on the shoulder of the highway, and he identified tire marks going down the shoulder of the road toward the grass. Both vehicles were heavily damaged, and Investigator Workman stated that although the speed limit was sixty miles per hour, the amount of damage to the vehicles evidenced "[a] higher speed than normal on that road." According to Investigator Workman, Defendant's truck struck the front quarter panel of the victim's vehicle, causing the vehicle to flip on its side and slide down into a grassy area. The steering wheel of the victim's vehicle was pushed to the center and almost into the front passenger's seat, and the fire department had to remove the roof to extricate the victim from the vehicle.

While Investigator Workman was at the scene, he learned from Captain Gann[2] that Defendant was driving the truck involved in the crash and that Defendant had been drinking alcohol sometime prior to the crash. Captain Gann suggested that they advise Defendant of his rights and question him. Officer Jeremy Wright, who was wearing a body camera, advised Defendant of his rights in the presence of Captain Gann and Investigator Workman. Investigator Workman said he did not smell any alcohol on Defendant at that time. In response to questioning by Captain Gann, Defendant recalled calling 911 and denied being under the influence of alcohol or drugs. Defendant was placed into custody on a charge of reckless endangerment, and Investigator Workman agreed that an investigation into whether Defendant was impaired while driving was ongoing. Investigator Workman recalled other crash investigations during which officers arrested

---

[2] Captain Gann's first name is not included in the record.

someone for specific charges, continued their investigation, and then amended or included additional charges as a result of their investigation.

Captain Gann instructed Officer Wright to transport Defendant to the police station and to prepare a search warrant to obtain a blood sample from Defendant. Investigator Workman testified that he did not have Defendant perform field sobriety tests because his practice was not to conduct such tests when the driver was involved in a head on collision. Investigator Workman explained that in such cases, the driver could have injuries that affected his performance on the tests. He acknowledged that Defendant received medical clearance at the scene but said that, regardless, he still would not have administered field sobriety tests. Investigator Workman said he did not ask Defendant to submit to a breathalyzer test because a blood test would produce more accurate results.

Investigator Workman remained at the scene for thirty to forty-five minutes after Officer Wright transported Defendant to the police station and then returned to the police station to complete a crash report and develop photographs. He saw Defendant in the booking room but did not interact with him. After Officer Wright obtained a search warrant, he transported Defendant to the Hamilton County Jail where Defendant's blood was drawn approximately four hours after the crash. Defendant's blood was sent to the Tennessee Bureau of Investigation ("TBI") for testing, and the results showed a blood alcohol content ("BAC") of .020 grams percent.

Investigator Workman testified that he received a call from a sergeant who informed him that an assistant district attorney general had instructed the officers to transport Defendant back to the police station and release him pending further investigation. Investigator Workman continued his investigation following Defendant's release. He listened to the recording of Defendant's 911 call, obtained witness statements from officers and emergency personnel who were at the scene, and interviewed Mr. Taylor. Investigator Workman recalled that some of the witnesses indicated smelling alcohol on Defendant. Investigator Workman obtained the GPS information from Defendant's vehicle, which showed Defendant's route, his U-turn, and the area where the crash occurred. Investigator Workman identified an aerial photograph that was taken several months after the crash and entered as an exhibit at trial depicting the area where Defendant made a U-turn, which was marked with orange cones. The photograph, which was made an exhibit at trial, shows a straight section of a four-lane highway divided by a concrete median with no apparent visual or geographical obstructions.

Investigator Workman also obtained the vehicle's crash data retrieval information, which showed that Defendant was going approximately seventy miles per hour prior to the crash and that he engaged his brakes and was turning his steering wheel left before impact. Investigator Workman stated that this information corroborated his findings from the scene

regarding how the crash occurred. Once the investigation was complete, officers met with an assistant district attorney general to determine the appropriate charges.

Martin Penny, a trooper with the Tennessee Highway Patrol at the time of trial and an SDPD officer at the time of the crash, responded to the crash scene and saw a sports utility vehicle on its side and a Ford F-150 truck with heavy front-end damage on the shoulder of the road. Defendant approached Officer Penny, and Officer Penny smelled a "very strong odor of alcohol coming off of [Defendant's] person." Officer Penny believed he informed another officer at the scene that he smelled alcohol on Defendant, but Officer Penny could not say with "absolute certainty" that he made such a report. He testified, "I know I would have said something like that because that's very pertinent in a crash like this." Officer Penny recognized Defendant as a former paramedic and asked him what he was doing there. Defendant replied, "I f***ed up." Officer Penny testified that due to the severity of the crash, he avoided engaging Defendant in conversation. Officer Penny stated that according to his statement to the police, Defendant told him, "I f***ed up, I can't believe I did that. I missed the exit and went down, I don't know how I ended up the wrong way. I f***ed up."

Steven Scott, an emergency medical technician with HCEMS at the time of the crash, responded to the scene and observed a damaged vehicle down an embarkment and Defendant by a black truck by the road. Mr. Scott testified that he had worked with Defendant previously and asked him whether he was injured. Defendant affirmed he was not injured and told Mr. Scott to check on the person in the other vehicle. Mr. Scott stated that he smelled a "hint of alcohol" on Defendant and explained, "It could have been from his clothing, it could have been from anything. I don't know about it, I just got a hint of alcohol." Mr. Scott said that his interaction with Defendant lasted approximately three to five seconds and that he did not believe Defendant was impaired. Defendant's speech was not slurred, he was not unsteady on his feet, he did not exhibit a different demeanor, and he followed directions. Mr. Scott acknowledged that he did not assess Defendant for impairment.

Mr. Scott testified that Defendant was familiar with the interchange through his former employment as a paramedic and that when they worked together, they had traveled through the interchange while responding to calls. Mr. Scott acknowledged that during those calls, he drove the ambulance while Defendant tended to patients in the back of the ambulance.

Jeremy Wright, an SDPD patrol officer at the time of the crash and a supervisor at the time of trial, testified that he responded to the scene and assisted in diverting traffic for forty to forty-five minutes. While directing traffic, Officer Wright heard from other officers that Defendant may have been involved in the crash, but Officer Wright did not

conduct any investigation at the scene. He testified that because he was wearing a body camera, one of his superior officers instructed him to place Defendant in custody for reckless endangerment and to advise him of his rights while recording him on the body camera. Officer Wright knew that Defendant had crashed into another vehicle while traveling the wrong way on the highway. The body camera footage, which was entered as an exhibit and played for the jury, showed an officer advising Defendant of his rights and informing him that he was being placed in custody for reckless endangerment. An officer briefly questioned Defendant, who stated that the crash was his fault and that he did not know how he ended up in the wrong lane. Defendant denied being under the influence of drugs or alcohol and mentioned sleeping at a friend's house.

A superior officer instructed Officer Wright to transport Defendant to the police department. Defendant was arrested at 6:50 a.m., and Officer Wright began transporting Defendant at 6:54 a.m. Once Defendant was in the backseat of Officer Wright's patrol car, Officer Wright smelled an odor of an intoxicant "coming from [Defendant's] person, from the backseat area." Officer Wright did not smell the odor in his patrol car prior to placing Defendant in the backseat. Officer Wright said he did not smell the odor on Defendant while at the scene, explaining that "there w[ere] a lot of other smells: The diesel from the fire trucks; just the outside air. We were in an open area, I believe some of the things that contributed to that, where I couldn't smell it until he was in a confined space."

Officer Wright testified that while transporting Defendant to the police station, he asked Defendant whether his BAC would be under the legal limit. Defendant replied, "Yes, I stopped drinking in time. I don't think there's going to be any alcohol in my system." Defendant said he had drunk alcohol during the previous night but that he had "slept it off." Officer Wright did not know whether Defendant had been administered field sobriety tests at the scene and said he would have administered the tests had he been instructed to do so.

Officer Wright arrived at the police department with Defendant at approximately 7:00 a.m. and completed "jail paperwork" while Defendant was in the booking room. The video recording of Defendant while in the booking room was entered as an exhibit at trial and played for the jury. Officer Wright did not believe he smelled alcohol on Defendant while in the booking room. At approximately 7:30 a.m., Officer Wright was instructed to prepare a search warrant for Defendant's blood. Officer Wright explained that because he had never prepared a search warrant previously, he first had to locate a template. Once he located a template, he completed the search warrant and affidavit and had other officers proofread the document. Meanwhile, two officers took Defendant to an interview room in the detective's building and returned him approximately ten minutes later. The Soddy Daisy City Judge came to the police department and signed the search warrant at approximately 8:45 a.m. while Defendant was with the other officers.

- 7 -

Officer Wright testified that once he secured the search warrant, he had to locate a blood draw kit. A member of the fire department originally was to draw Defendant's blood but decided against doing so due to a conflict of interest. At approximately 9:06 a.m., Officer Wright transported Defendant to the Hamilton County Jail for his blood to be drawn. While Defendant's blood was being drawn, Officer Wright received a text message from Investigator Workman that a sergeant had ordered that Defendant "was not in custody and to, ultimately, unarrest him." Officer Wright was unclear as to why Defendant was to be released.

Officer Wright was present for the blood draw and said Defendant's blood was drawn into two vials included in a blood kit provided by the TBI. The vials were sealed inside a plastic container and then in another box, and Officer Wright initialed the box. He also completed a toxicology request form, and the box containing the blood sample was placed in a locker for which Officer Wright did not have a key. Another officer then transported the box to the TBI. Officer Wright noted that according to the toxicology report, Defendant's blood was collected on July 3, 2018, at 9:40 a.m., approximately four hours after the crash, and Defendant's BAC was .020 grams percent.

On cross-examination, Officer Wright agreed that Defendant was cooperative at the scene, answered his questions, and spoke clearly. Officer Wright also agreed that Defendant was cooperative at the police department and that the delay in obtaining a blood sample was not attributable to Defendant's actions. When asked whether Defendant's actions were consistent with someone who had a BAC of .020 grams percent, Officer Wright replied, "I think at the time I was with him in the booking room, I mean I think that would be consistent at that point in time, I think that's accurate." When asked whether Defendant's actions at the scene were consistent with the results of the blood analysis, Officer Wright stated that he had limited interaction with Defendant at the scene and that he did not have the ability to judge" a person's BAC "by how they're acting."

Officer Wright agreed that he did not have probable cause to arrest Defendant for DUI, but Officer Wright did not know whether another officer had such probable cause. He explained that the search warrant stated that the officers were seeking to obtain a blood sample "on a possible DUI . . . . So we were exploring the possibility that this may have existed in his blood. That's what the search warrant is for." Officer Wright's only other involvement in the investigation following Defendant's release was obtaining a search warrant for Defendant's cell phone.

TBI Special Agent and Forensic Scientist April Bramlage testified as an expert in forensic toxicology that she analyzed Defendant's blood sample and determined that the sample contained alcohol at a level of .020 grams percent. She testified that the TBI had a "pretty tight and pretty stringent" procedure to quantitate ethanol, which required testing

the sample in a forward and backward order to determine whether the results are similar. The first test resulted in a level of .0203 grams percent and the second in a level of .0201 grams percent, resulting in an average BAC reported as .020 grams percent.

Special Agent Bramlage noted that the toxicology report included a "slight measurement of uncertainty statement" of plus or minus .002 grams percent. She explained that if she tested the sample one hundred times, ninety-nine of the results would be in the range of .018 to .022 grams percent. She stated that the TBI reports BAC as low as .01 grams percent and that anything below that number would result in a report that the blood tested negative for alcohol. In her expert opinion, there was a measurable amount of alcohol in Defendant's blood sample above the TBI's detection range.

Dr. Kenneth Ferslew, an expert in forensic toxicology and pharmacology, testified that he performed retrograde extrapolation using Defendant's reported BAC of .020 grams percent four hours after the crash to estimate his BAC at the time of the crash. Dr. Ferslew explained that once alcohol reaches the stomach, it is absorbed into the blood, causing the BAC to rise and that the maximum BAC is reached once the alcohol is fully absorbed. Once the maximum BAC is reached, the elimination phase begins, causing the BAC to decrease. Dr. Ferslew stated that if Defendant did not consume any additional alcohol between the crash and the blood draw, he would have been in the elimination phase—metabolizing, excreting, and evaporating alcohol—at the time of the draw, causing his BAC to decrease. Although Dr. Ferslew did not know Defendant's actual elimination rate, he noted that the minimum elimination rate is .009 grams percent per hour and that the maximum elimination rate is .025 grams percent per hour. Dr. Ferslew multiplied each elimination rate by the four hours between the crash and the blood draw and added the BAC of .020 grams percent from the TBI report to determine that Defendant had an estimated BAC of .056 to .120 grams percent at the time of the crash.

Dr. Ferslew concluded that Defendant "would have been under the influence of a blood alcohol concentration at the time of the event." He testified that alcohol depresses the nervous system at such concentration, resulting in an expansion of personality, psychomotor impairment, a slower reaction time, a change in the ability to perceive and react, and lack of attention to detail. He explained that the degree of these effects depends upon the individual's tolerance to alcohol but that alcohol at such concentration "would have an effect versus a sober non-blood alcohol condition."

On cross-examination, Dr. Ferslew testified that he utilized the Widmark formula for retrograde extrapolation, which is based on the elimination of alcohol in a linear fashion. He acknowledged that the application of the Widmark formula results in greater error when attempting retrograde extrapolation of a BAC of less than .020 grams percent. He stated that when the BAC is less than .020 grams percent, the Michaelis-Menton

formula more accurately calculates elimination by using percentage per unit of time. He stated that when the BAC is less than .020 grams percent, "Michaelis-Menten is the predominant way to try and mathematically model blood alcohol" but that the Widmark formula is appropriate to use when the BAC is .020 grams percent or more. Dr. Ferslew disagreed with the opinion of defense expert, Dr. Jimmie Valentine, that retrograde extrapolation using the Widmark formula was not reliable when the BAC is .020 grams percent and that the Michaelis-Menten formula applies instead. Dr. Ferslew also disagreed with Dr. Valentine's opinion that the BAC threshold for the application of the Michaelis-Menten formula should be increased to .025 grams percent.

In response to a jury question regarding the interaction between alcohol and adrenaline, Dr. Ferslew testified that although alcohol is a depressant, the addition of adrenaline acts as a stimulant such that "[y]ou're going to seem more aware, more in focus. You're going to speak faster, quicker, maybe a little more precise than you would if you were just under the influence of alcohol without adrenaline being there."

TDOT traffic operations manager Christopher Smith, who was assigned to the region that includes Hamilton County, testified that he was familiar with the Highway 27 and Highway 111 interchange and had worked in that area during his entire seventeen-year career with TDOT. Prior to his role as a traffic operations manager, he was a traffic safety manager, which included occupational health and safety tasks to ensure the safety of TDOT employees. He affirmed that as the traffic safety manager, he was familiar with the signage and markings at the interchange, and he indicated those markings on photographs of the interchange from April 2018 and July 2022 that were entered as exhibits at trial.

Mr. Smith noted the area included yellow lines on the roadway and lenses embedded in the roadway. He explained that when a driver is traveling in the correct direction in a lane, the yellow line will be on the driver's left but that when the driver is traveling in the wrong direction, the yellow line will be on the driver's right. He further explained that the lenses embedded in the roadway will appear clear if the driver is traveling in the correct direction and red if the driver is traveling in the wrong direction.

On cross-examination, Mr. Smith agreed that there was no nighttime illumination on the interchange, specifically in the area where Defendant made a U-turn. Mr. Smith acknowledged that other methods of alerting drivers to the correct lanes of travel included "Do Not Enter" signs, "One Way" signs, and directional arrows in the roadway.

On redirect examination, Mr. Smith testified that signs are installed in different areas based on the chances of a driver traveling the wrong way. He stated that the area around the interchange was "a controlled access facility" and that "there are no signs there because the only way you can get a wrong-way driver is to make a 180-degree turn.

Whereas, on a non-controlled access facility, you could make a 90-degree turn and go the wrong way." He said that during his seventeen-year career with TDOT, Defendant's was the only case he recalled of a driver going the wrong way and causing a head-on collision near the interchange.

Jeff Murphy, who managed the crash and traffic data for TDOT, testified that except for 2020, which was an "anomaly" due to the COVID-19 pandemic, the traffic volume around the interchange had risen since 2018. He noted that in 2022, an average of 5,468 unique trips were taken by drivers down Highway 111 each day, which was equal to 1,421,680 trips for the year. He further noted that in 2022, an average of 14,422 trips were taken by drivers southbound on Highway 27, which was equal to 3,749,720 trips for the year. Of the forty-five crashes that occurred around the interchange from 2015 until May 2023, two were alcohol-related, two involved fatal injuries, and only one was a head-on collision.

Dr. Steven Cogswell, the interim chief medical examiner with the Hamilton County Medical Examiner's Office, performed the autopsy of the victim and testified that the victim's cause of death was multiple blunt force injuries due to a motor vehicle collision and that the manner of his death was accidental. The victim's injuries included a fracture across the base of his skull, two contusions to his brain, an injury to the area where the head connects to the neck, incised wounds caused by broken glass, rib fractures that caused bruises and bleeding into the lungs, lacerations to the spleen and liver, a laceration in the left armpit, multiple other lacerations and abrasions, and fractures to the left humerus, the right wrist, the ring finger, the femur, and the right ankle. No drugs or alcohol were in the victim's system.

The jury was transported to view the scene, including the area of Mr. Taylor's home, the area where Defendant made the U-turn, and the scene of the crash. The State then rested its case.

### B. Defense Proof

Corporal Christopher Walker with the Hamilton County Sheriff's Department ("HCSD") testified that he was on his way to work on the morning of July 3, 2018, when he drove up to the scene, and he assisted officers in controlling the traffic. When Corporal Walker approached the scene, he saw Defendant, whom he recognized as a former employee of the HCEMS and a former reserve deputy with HCSD. Corporal Walker approached Defendant, who "appeared to be in kind of a state of shock." Corporal Walker asked Defendant if he was okay, and Defendant replied, "[Y]es." Corporal Walker then asked Defendant whether he was involved, and Defendant replied, "[Y]es." Corporal

Walker testified "that was pretty much the limit of our conversation from that point." He did not observe any signs that Defendant was impaired or intoxicated.

Corporal Walker testified that vehicles traveling the wrong way down Highway 111 was not "uncommon" and that he had received or heard many be-on-the-lookout alerts for drivers going the wrong way on Highway 111. He had no personal knowledge of any other driver performing a U-turn onto the southbound side of Highway 111 and then traveling southbound on the northbound side at the interchange.

Greg Allen, who was employed with the HCEMS and had previously served as Defendant's supervisor for three to four years, testified that he responded to the crash scene and assessed Defendant for approximately thirty seconds. Mr. Allen said he was approximately eighteen inches away from Defendant and did not smell any alcohol coming from Defendant's person or notice any signs of intoxication or impairment. Mr. Allen testified that Defendant was "speaking normally" and that the "[o]nly thing [Defendant] actually said to me was that he was at fault. And I told him stop, I don't need details. And that's the only thing I talked to him about." Mr. Allen stated that he had not previously observed vehicles traveling the wrong way through the interchange but that vehicles traveling the wrong way down Highway 27 was "pretty common."

Dr. Jimmie Valentine, an expert in clinical pharmacology and forensic toxicology, testified that Dr. Ferslew's retrograde extrapolation of Defendant's BAC results from a sample of his blood taken four hours after the crash was unreliable. Dr. Valentine noted that a BAC of .020 grams percent was "a very low reading of an alcohol" and that based on the TBI's uncertainty rating of plus or minus .002 grams percent, it was just as probable that the BAC was .018 grams percent as it was .022 grams percent. He stated that due to the low BAC, the Widmark formula was not appropriate to use for retrograde extrapolation because such low concentrations of alcohol are not being eliminated in a linear fashion as presumed in applying the Widmark formula. Dr. Valentine explained that, instead, under Michaelis-Menten formula, the elimination rate for such low concentrations of alcohol will vary over time. He stated that the scientific community generally accepts that Michaelis-Menten formula applies to BACs of .020 grams percent or below and that some scientific literature suggests that Michaelis-Menten formula begins at BACs of .030 grams percent. Dr. Valentine opined that Dr. Ferslew's use of the Widmark formula to perform retrograde extrapolation on Defendant's BAC of .020 grams percent was unreliable and that Dr. Ferslew's conclusion that Defendant had an estimated BAC of .056 to .120 at the time of the crash was likewise unreliable. Dr. Valentine believed his opinions were supported by scientific literature that was well-accepted within the scientific community.

On cross-examination, Dr. Valentine testified that he did not recall whether he had reviewed the TBI's testing data. He had "an indication" that Defendant drank alcohol the

night prior to the crash but did not have "a good representation of how much he had actually drunk." Dr. Valentine had a "rough idea" of what time Defendant began drinking alcohol but did not know what time Defendant stopped drinking. Dr. Valentine agreed that Defendant was in the elimination phase when his blood was drawn four hours after the crash and that Defendant's BAC could have been much higher than .020 grams percent at some point depending upon the amount of alcohol Defendant had consumed.

Dr. Valentine noted that not everyone who has a BAC of .08 grams percent is too impaired to drive but that most people are. He recognized that some people with a BAC of less than .08 grams percent could be too impaired to drive. He stated that "epidemiology studies would suggest that you start to get a little bit of an inflection in a dose response curve when you get to .05. So .05 and above, you get to get a little bit inflection, and it gets greater at .08." Dr. Valentine stated that a person's vision "starts to get a little bit dim" at a BAC of .03 grams percent.

On redirect examination, Dr. Valentine testified that the value reached in conducting retrograde evaluation must be consistent with other evidence in the case. He agreed that BAC is only one piece of information and that other evidence such as the officers' observations and their belief regarding impairment also should be considered.

Steven Becker, a mechanical engineer and an expert in the field of accident reconstruction and human factors analysis, performed an accident reconstruction and a human factor analysis to determine the sequence of events and whether Defendant's driving was erratic or improper prior to the crash. He reviewed police reports, the affidavit of complaint, officers' statements and emails, photographs and other discovery documents, and GPS and CDR data from Defendant's vehicle. Mr. Becker visited and photographed the crash site in June 2019, attended the jury's viewing of the crash site, and reviewed the crash site on Google Earth.

Mr. Becker testified that Defendant's GPS data from the morning of the crash began at 5:25 a.m., that the crash occurred at 5:39 a.m., and that, thus, Defendant drove for thirteen to fourteen minutes prior to the crash. Defendant exited Mr. Taylor's driveway and drove down Retro Hughes Road, which Mr. Becker described as a "narrow twisty road" with several "sort of 180-degree-ish types turns or double S turns, depending on the curves." Mr. Becker stated that based on the GPS data, Defendant did not drive erratically down the road and that his driving was "fairly consistent with typical driving on that stretch."

Defendant turned and began driving southbound on Highway 27. Mr. Becker identified the area where Defendant made the U-turn past the interchange where the two southbound lanes of Highway 111 merged from the left with the two southbound lanes of

Highway 27. Mr. Becker noted that during the jury's viewing of the scene, he observed a sign at the interchange stating, "traffic merging from the left," which was not present when he viewed the scene in June 2019. Highway 111's two southbound lanes and Highway 27's two southbound lanes were separated by a solid white line. A solid yellow line was on the left side of the far-left southbound lane of Highway 111 next to a concrete barrier. The four northbound lanes of travel were on the other side of the concrete barrier. Mr. Becker stated that although the headlights of any traffic on the northbound lanes would have been visible from the southbound lanes, the northbound lanes would not have been visible from the southbound lanes without such traffic.

Mr. Becker testified that in the absence of traffic on the northbound lanes, Defendant would not have been able to see the roadway on the other side of the concrete barrier when he decided to make the U-turn. Mr. Becker stated that the roadway on which Defendant made the U-turn "looks like four sets of lanes" and that based on the appearance of the roadway prior to the bridge, "it's reasonable to think that a driver might suspect that those were northbound travel lanes to the left of the solid line." Mr. Becker noted that no overhead or ambient lighting or red reflectors were in the area where Defendant made the U-turn and that there were no "wrong way" signs or signs indicating that U-turns in the area were prohibited. Mr. Becker stated that the GPS data did not show Defendant "swerving" or "veering" prior to making the U-turn but showed that Defendant's travel path was "smooth in the lane" and that Defendant came "to a smooth stop with light braking," performed the U-turn, and "accelerate[d] with uniform length in acceleration." Mr. Becker concluded that it was reasonable under the circumstances known to Defendant to make a U-turn at that location and that while Defendant's decision to make a U-turn in that area was "incorrect," his steering and driving were "not erratic." However, Mr. Becker acknowledged that he did not factor Defendant's familiarity with the interchange or his alcohol use in determining whether his decision to make a U-turn was reasonable.

Mr. Becker believed Defendant drove the wrong way for approximately thirty-nine seconds before the crash. Defendant traveled back through the interchange where the two southbound lanes of Highway 27 separated from the two southbound lanes of Highway 111. He continued northbound down a southbound lane of Highway 111. Prior to the crash, the victim was in the right travel lane, and Defendant was in the left travel lane, "which would be his right." The vehicles were traveling around a curve prior to the collision, and Mr. Becker stated that based on the geometry of the curve and the positions of the two vehicles, the victim's headlights were not directed in an oncoming fashion toward Defendant's vehicle. Mr. Becker noted that the collision occurred at the shoulder of the roadway, that the victim traveled about a lane width, and that Defendant traveled laterally across one and one-half lanes to reach the shoulder. Mr. Becker prepared an aerial photograph, which was entered as an exhibit at trial, upon which he added yellow and blue lines to show the paths taken by Defendant and the victim leading up to the crash.

- 14 -

Mr. Becker stated that since it would have taken more time for Defendant to cross to the shoulder than the victim, Defendant would have perceived and reacted first. Mr. Becker concluded that Defendant "steered and braked consistent with a typical driver when faced with an approaching vehicle in the same travel lanes." Mr. Becker said the Event Data Recorder and GPS data showed that Defendant was "attempting to get off the roadway and slowing, which are the two viable options for when you encounter that type of hazard."

The defense rested its case, and the State dismissed the charges of DUI per se and failure to yield. The jury convicted Defendant of vehicular homicide by intoxication, reckless driving, unlawfully driving on a divided highway, speeding, failure to exercise due care, DUI, and reckless vehicular homicide. The jury acquitted Defendant of the charge of failure to maintain the proper lane.

During the January 22, 2024 sentencing hearing, the trial court merged Defendant's convictions into one conviction of vehicular homicide by intoxication. The court then sentenced Defendant to nine years' incarceration for the conviction of vehicular homicide by intoxication as a Range I, standard offender with a thirty percent release eligibility percentage.[3] The court did not impose sentences for Defendant's other convictions, and although the court entered separate judgments for each conviction, the only judgment listing a sentence is the judgment for Defendant's conviction of vehicular homicide by intoxication. Defendant filed a timely motion for new trial. Following a hearing, the trial court entered an order on March 11, 2024, denying Defendant's motion. On March 14, 2024, Defendant filed a timely notice of appeal.

## II. Coram Nobis Proceedings

On April 12, 2024, while Defendant's direct appeal was pending in this court, he filed a petition for writ of error coram nobis in which he alleged that newly discovered evidence might have led to a different result at trial. In his initial and amended petitions, Defendant raised multiple allegations of misconduct by Officer Wright, which Defendant maintained would have been admissible as impeachment evidence at trial. Following a series of evidentiary hearings, the trial court found that the newly discovered impeachment evidence was limited to the shared conclusions of two lieutenants that Officer Wright was untruthful during an internal SDPD investigation and that the police chief "wrongly ordered at least one investigation closed as unfounded." Neither party challenges this

---

[3] We note that Tennessee Code Annotated section 40-35-501 has since been amended to provide that for offenses of vehicular homicide by intoxication committed on or after July 1, 2022, the defendant "shall serve one hundred percent (100%) of the sentence imposed by the court undiminished by any sentence reduction credits the person may be eligible for or earn." Tenn. Code Ann. § 40-35-501(bb)(1), (2)(C).

ruling on appeal. Thus, we limit our summary of the arguments made in the petition and the evidence presented during the hearings to the arguments and evidence related to those instances.

Defendant asserted in his coram nobis petition that on March 20, 2024, following the October 2023 trial, the prosecution disclosed to defense counsel that Officer Wright was subject to an internal affairs investigation in May 2023 and was found to have been untruthful. Defendant stated that according to a July 6, 2023 report, SDPD Lieutenant Jake Elrod spoke with a complainant in May 2023 who alleged that in 2018, Officer Wright showed a nude photograph of himself to the complainant and a juvenile while at a gym. According to the report, Lieutenant Elrod provided details of the complaint to the district attorney general and spoke to Officer Wright, who denied possessing or showing any such photograph to others. Officer Wright later admitted to Lieutenant Eric Jenkins that he possessed the photograph in question, and Lieutenant Elrod found that Officer Wright potentially had engaged in off-duty misconduct and had been untruthful. Defendant attached to his petition an affidavit from defense counsel, the prosecutor's March 21, 2024 email to defense counsel attaching a redacted report, and a copy of the redacted July 6, 2023 report.

Defendant contended that the finding that Officer Wright was untruthful during an investigation was "classic impeachment material" and would have been admissible at Defendant's trial pursuant to Tennessee Rule of Evidence 608(a). He also claimed that "information about the underlying investigation itself (and the conduct about which Officer Wright was untruthful) could have been admissible under [Rule] 608(b), pending a jury-out hearing." Defendant maintained that Officer Wright's credibility "was a significant issue" and that the admission of the newly discovered evidence may have resulted in a different outcome at trial. Defendant argued that had he presented the newly discovered evidence during the pretrial hearing on his motion to suppress the blood alcohol evidence based on challenges to the search warrant affidavit prepared by Officer Wright and Officer Wright's delay in obtaining the blood sample, the trial court might have granted the motions.

In its response, the State agreed that Defendant was entitled to the information regarding the allegation that Officer Wright was untruthful and that the information was not disclosed to Defendant prior to trial. The State denied that the district attorney general's office was aware of the information or that it possessed the report prior to March 19, 2024. While taking no position on the veracity of the allegations against Officer Wright, the State noted that SDPD Chief Eric Petty had informed the prosecution that he and former Chief Mike Sneed disagreed with Lieutenant Elrod's conclusion that Officer Wright had been untruthful. Rather, the State argued that even if Officer Wright was untruthful, "that single incident of untruthfulness would have minimal impact, if any, on [Officer] Wright's

credibility." The State maintained that the only disputed information included in the search warrant and Officer Wright's trial testimony that turned on Officer Wright's credibility was his smelling an intoxicant emanating from Defendant's person. The State reasoned that in light of the testimony of other witnesses at trial who also smelled an intoxicant on Defendant and evidence of Defendant's drinking alcohol on the night prior to the crash, the admission of the newly discovered impeachment evidence "would not have resulted in a different judgment."

Defendant subsequently moved this court to stay his direct appeal proceedings pending resolution of his coram nobis petition. This court granted Defendant's motion.

During evidentiary hearings on April 20 and May 29, 2024, Defendant presented testimony from Lieutenants Elrod and Jenkins that Officer Wright was untruthful during an internal investigation into an allegation that Officer Jenkins had shown a nude photograph of himself to two females, one of whom was a minor. According to Lieutenants Elrod and Jenkins, they approached Chief Sneed about disclosing the information to the parties prior to Defendant's trial, and Chief Sneed made statements, which they interpreted as threats to their employment if they disclosed the information. Although the State does not challenge the veracity of the testimony of Lieutenants Elrod and Jenkins on appeal, the State presented the testimony of Chief Sneed during the evidentiary hearings that he disagreed that Officer Jenkins had been untruthful during the investigation, and Chief Sneed determined that the complaint against Officer Wright was "unfounded."

On July 18, 2024, the trial court entered a written order granting Defendant partial relief. The court found that the newly discovered evidence consisted of the shared conclusions of Lieutenants Elrod and Jenkins that Officer Wright had been untruthful during an internal SDPD investigation and that Chief Sneed "wrongly ordered at least one investigation closed as unfounded." The court noted the State's concession that Defendant was without fault in failing to discover the evidence prior to trial. The court found that Chief Sneed "provided rational explanations regarding why both investigations were properly deemed unfounded and why the investigations need not be disclosed to the DA's Office before Defendant's trial." The court also found that "[r]egardless of this conflict between two credible sources, the combined testimony of [Lieutenant] Elrod and [Lieutenant] Jenkins certainly qualifies as admissible impeachment evidence" and "carries significant credibility." The court concluded that the newly discovered impeachment evidence existed but was not discovered by the time of Defendant's trial, that the evidence was admissible for purposes of impeachment against Officer Wright, and that "coming from two high-ranking SDPD officers who worked with [Officer] Wright, [was] credible."

The court next examined whether the impeachment evidence might have resulted in a different judgment had it been presented at trial. The court noted that portions of Officer

Wright's testimony during the pretrial hearings and at trial were "exculpatory," such as his testimony that Defendant's movements and speech at the crash scene did not indicate impairment and could have been impacted from the crash. The court found that the only personal observation that Officer Wright included in the search warrant affidavit for the blood draw was his smelling an odor of an intoxicant emanating from the police vehicle used to transport Defendant but that "[t]he fact that two other officers observed the same odor renders [Officer] Wright's observation practically immune to impeachment at trial." The court found that although removal of Officer Wright's observations from the search warrant affidavit "reduces the probable cause basis for the warrant," Defendant's admissions that he had consumed alcohol and was traveling the wrong way on the highway when he struck the victim's vehicle were sufficient to establish probable cause for the issuance of the search warrant.

However, the court noted that Officer Wright's testimony also related to the chain of custody for Defendant's blood sample. The court found that the State established the chain of custody of the blood sample to the court's satisfaction such that the blood sample was admissible but that "not having the benefit of the newly discovered evidence impaired Defendant's ability to fairly challenge the evidence's weight" before the jury. The court noted that Officer Wright's testimony regarding the chain of custody was uncorroborated. The court continued:

> Compounding the issue, chain-of-custody analysis typically examines whether or not officers abided by the appropriate standards of care. Along with credibility, the newly discovered evidence involves a major fracture within SDPD regarding whether the internal investigations on [Officer] Wright were wrongly deemed unfounded. This indisputable rift invokes the arguable possibility that SDPD administration did not hold [Officer] Wright to the appropriate standards of care. Again, while Chief Sneed provided rational explanations why the internal investigations were deemed unfounded, the "disturbing" nature of the newly discovered evidence may have caused the jury to come to a different conclusion about the chain of custody's evidentiary weight. In fairness, this evidence would only have affected the blood alcohol evidence.

The court found that the newly discovered evidence might have resulted in a different judgment as to Defendant's convictions for vehicular homicide by intoxication and DUI, both of which related to Defendant's BAC, had the evidence been presented at trial. The court vacated Defendant's convictions for vehicular homicide by intoxication and DUI and granted him a new trial on the two charges. The court ordered that the rulings on the pretrial suppression hearings and Defendant's remaining convictions "remain in place." Because the Defendant's vehicular homicide by intoxication conviction was

vacated, the court reversed its order merging Defendant's remaining convictions into the vehicular homicide by intoxication conviction.

Both parties filed timely notices of appeal from the trial court's coram nobis order. This court consolidated Defendant's direct appeal and both parties' appeal of the coram nobis order.

**Analysis**

In this consolidated appeal, Defendant challenges: (1) the sufficiency of the evidence supporting his convictions for vehicular homicide by intoxication and DUI; (2) the denial of his motions to suppress in which he challenged the search warrant for the blood draw; (3) the admission of the results of the blood analysis and the retrograde extrapolation as unreliable under Tennessee Rules of Evidence 403 and 703; (4) the admission of Mr. Smith's testimony as improper lay opinion; (5) the trial court's decision to allow the jury to visit the scene; and (6) the jury instructions on mistake of fact and on reckless vehicular homicide. Defendant also contends that the cumulative effect of the errors at trial warrants relief and that the trial court erred in failing to grant coram nobis relief for all his convictions. In its cross-appeal, the State asserts that the trial court erred in granting Defendant coram nobis relief for his convictions of vehicular homicide by intoxication and DUI.

Our supreme court has set forth the procedure to be followed when a defendant seeks coram nobis relief while his direct appeal is pending in this court. *See State v. Mixon*, 983 S.W.2d 661, 671-72 (Tenn. 1999). When a defendant files a petition for writ of error coram nobis in the trial court, the defendant should move this court to stay the direct appeal proceedings pending the trial court's decision in the coram nobis proceedings. *Id.* at 672. "Under most circumstances, the motion to stay should be granted," and "[a]ny appeal from the trial court's decision on the petition for writ of error coram nobis is to be consolidated with the defendant's pending appeal as of right." *Id.* (citations omitted). If the trial court grants coram nobis relief and the State appeals the trial court's decision, this court should first consider the issues related to the coram nobis decision, and if this court affirms the trial court's granting of coram nobis relief, the issues raised by the defendant on direct appeal become moot and need not be addressed by this court. *Id.* If the trial court denies coram nobis relief and the defendant appeals, this court should first address the issues raised by the defendant on direct appeal, and if this court concludes that a new trial is warranted based on the issues raised on direct appeal, this court need not address the issues raised in the coram nobis appeal. *Id.* Our supreme court reasoned that this procedure "recognizes that coram nobis is an *extraordinary* procedural remedy in this modern regime. It fills only a slight gap into which few cases fall." *Id.* (citing *Penn v. State*, 670 S.W.2d 426, 428 (Ark. 1984)). "It is appropriate, therefore, that an appellate court consider

whether relief is available pursuant to the writ only after it has determined that none of the issues raised in a defendant's appeal as of right warrant a new trial." *Id.*

In the instant case, Defendant moved this court to stay the direct appeal proceedings pending resolution of the coram nobis proceedings in the trial court, and this court granted the motion. The trial court granted Defendant's coram nobis petition in part, vacating Defendant's convictions for vehicular homicide by intoxication and DUI. Both parties appealed the trial court's coram nobis order, and this court consolidated Defendant's direct appeal with both parties' appeal of the coram nobis order. Our supreme court in *Mixon* did not address the order in which this court should consider the issues raised when a defendant's direct appeal is consolidated with an appeal by both parties of a trial court's order granting coram nobis relief in part, and we have located no other opinions from this court or the Tennessee Supreme Court addressing the order in which this court should consider the issues raised during the circumstances of this case. We note that because the trial court only granted partial coram nobis relief, any decision to affirm the trial court's order would not render all issues raised by Defendant on direct appeal moot. Based on our supreme court's recognition of coram nobis as an extraordinary procedural remedy filling a "slight gap" into which few cases fall, we will address whether Defendant should be granted a new trial based on issues that he raises on direct appeal before addressing whether he should be granted a new trial on his coram nobis petition. Furthermore, we conclude that Defendant is not entitled to relief regardless of the order in which we address the issues raised.

I. Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence supporting his convictions for vehicular homicide by intoxication and DUI, asserting that the State failed to present sufficient evidence of impairment. The State responds that the evidence presented at trial was sufficient to establish Defendant's impairment and support his convictions for vehicular homicide by intoxication and DUI. We agree with the State.

We review a challenge to the sufficiency of the convicting evidence to determine whether, "after viewing the evidence in the light most favorable to the prosecution" and providing the State with "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom," "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citations omitted); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citations omitted); Tenn. R. App. P. 13. Our review "is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). Importantly, a guilty verdict removes

the presumption of innocence and replaces it with one of guilt on appeal, shifting the burden to the defendant to demonstrate why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

We decline Defendant's invitation to revisit witness credibility or any purported discrepancies in the evidence because the jury, not this court, resolves all questions involving the credibility of the witnesses, the weight and value to be given to evidence, and the factual disputes raised by such evidence. *See Dorantes*, 331 S.W.3d at 379 (citing *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). Accordingly, this court will neither re-weigh nor reconsider the evidence when evaluating the sufficiency of the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

As applicable to the present case, vehicular homicide by intoxication is "the reckless killing of another by the operation of an automobile . . . as the proximate result of . . . [t]he driver's intoxication, as set forth in § 55-10-401." Tenn. Code Ann. § 39-13-213(a)(2). Code section 55-10-401 prohibits a person from driving or being in physical control or an automobile on any public road or highway, while:

> Under the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess[.]

Tenn. Code Ann. § 55-10-401(1).

The evidence presented at trial, when viewed in the light most favorable to the State, established that Defendant spent the night prior to the crash drinking bourbon with Mr. Taylor. They both had six drinks each which contained more than one shot but less than two shots of bourbon. Apparently recognizing the danger in drinking such a quantity of alcohol, Defendant had arranged to spend the night at Mr. Taylor's house. They stopped drinking alcohol at approximately 1:00 a.m., and Mr. Taylor went to bed while Defendant lay down on a couch. Defendant left the home at approximately 5:25 a.m., and the crash occurred approximately fourteen minutes later.

After Defendant missed his exit, he made a U-turn in the middle of the roadway, and despite multiple markers on the roadway indicating that he was traveling in the wrong direction, Defendant drove the wrong way while speeding. Defendant and the victim were traveling in different lanes. However, as Defendant approached the victim, and contrary to defense counsel's claim during oral argument before this court, Defendant swerved into

the victim's lane and to the shoulder of the roadway where Defendant struck the victim's vehicle head on. Although Mr. Becker opined that Defendant's actions while driving were reasonable under the circumstances, the jury, through its verdict, rejected this testimony, which was its prerogative as the trier of fact. Rather, the evidence of Defendant's driving, when viewed in the light most favorable to the State, was indicative of impairment. *See State v. Hinds*, No. E2022-00544-CCA-R3-CD, 2023 WL 5164634, at *15 (Tenn. Crim. App. Aug. 11, 2023) (concluding that the evidence was sufficient to establish impairment as an element of vehicular homicide by intoxication and DUI based in part on the defendant's driving, "which included excessive speeding, failing to maintain her lane, and straddling the center lane"), *perm. app. denied* (Tenn. Jan. 11, 2024); *State v. Dye*, No. M2018-01191-CCA-R3-CD, 2019 WL 5172275, at *6 (Tenn. Crim. App. Oct. 15, 2019) (recognizing that "the Defendant's driving demonstrated signs of impairment, including passing where prohibited, failure to maintain his lane on two occasions, veering into the oncoming lane where visibility was obscured by a hill, and excessive speed").

Following the crash, Defendant admitted to the 911 operator that he had been drinking alcohol the night prior to the crash and that he was driving the wrong way when he struck the victim's vehicle. Two officers and an emergency medical technician detected the odor of alcohol on Defendant. Officer Penny smelled "a very strong odor" on Defendant. Although Defendant was not staggering, slurring his words, or showing other physical signs of impairment, Dr. Ferslew testified that with the addition of adrenaline, "[y]ou're going to seem more aware, more in focus. You're going to speak faster, quicker, maybe a little more precise than you would if you were just under the influence of alcohol without adrenaline being there."

Testing of Defendant's blood sample taken approximately four hours after the crash resulted in a BAC of .020 grams percent. Dr. Ferslew determined that based on retrograde extrapolation, Defendant's BAC was .056 to .120 grams percent at the time of the crash. On appeal, Defendant asserts that Dr. Ferslew's calculations were unreliable. Defendant presented expert testimony at trial to challenge the reliability of Dr. Ferslew's calculations, but through its verdict, the jury chose to credit Dr. Ferslew's testimony and to reject the testimony of the defense expert. We decline to revisit the jury's credibility determinations. *See Dorantes*, 331 S.W.3d at 379 (citing *Campbell*, 245 S.W.3d at 335).

Furthermore, unlike the offense of DUI per se, the State need not establish Defendant's BAC at the time of the crash to support the convictions for vehicular homicide by intoxication and DUI. *See Hinds*, 2023 WL 5164634, at *15; *Dye*, 2019 WL 5172275, at *7. Instead, the State need only establish that Defendant "was under the influence of an intoxicant which impaired his ability to safely operate a motor vehicle by depriving him of the clearness of mind and control of himself that he would otherwise possess." *Dye*, 2019 WL 5172275, at *7 (citations omitted); *see* Tenn. Code Ann. § 55-10-401(1). Upon

viewing the evidence in the light most favorable to the State, we conclude that a reasonable jury could have found that Defendant was driving under the influence of an intoxicant at the time of the crash. Accordingly, the evidence is sufficient to support Defendant's convictions for vehicular homicide by intoxication and DUI.

## II. Denial of Motions to Suppress

Defendant challenges the trial court's denial of his multiple motions to suppress the result of the analysis of his blood sample. He maintains that the search warrant affidavit failed to establish probable cause that evidence of a crime would be present in the blood sample. He also maintains that the search warrant affidavit included false statements or misrepresentations and omitted material information that would have refuted probable cause in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). The State responds that the search warrant affidavit provided probable cause to believe that Defendant was driving under the influence and that the trial court properly denied Defendant's motions. We agree with the State.

### A. Suppression Hearings

Prior to trial, on June 17, 2019, Defendant filed a motion to suppress his blood sample obtained through a search warrant and the results of the analysis of the blood sample, asserting that the search warrant affidavit failed to establish probable cause. During a hearing held on September 18, 2019, before the first trial judge, the parties relied upon the affidavit and search warrant that was attached to Defendant's motion and entered as an exhibit during subsequent hearings.

Officer Wright, who prepared the affidavit, noted his ten years of experience with the SDPD and stated that he had reason to believe that within Defendant's person

> there exists evidence of any intoxicant, marijuana, controlled substance, drug, substance affecting the central nervous system or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of himself which he would otherwise possess, which would serve as evidence of a violation of T.C.A. § 55-10-401 [Driving Under the Influence].

The affidavit listed the following facts as establishing probable cause that a crime had been committed and that the evidence described was within Defendant's body or blood:

> On Tuesday, July 3, 2018[,] [Defendant] was involved in a motor vehicle crash which resulted in the death of the other driver. [Defendant] was

- 23 -

traveling north on [H]ighway 111 in the southbound lane when the head-on collision occurred. I smelled an odor of an unknown intoxicant emanating from [Defendant's] person and, after being read *Miranda* rights, [Defendant] admitted to consuming alcohol the night before this event.

A magistrate signed and dated the affidavit and search warrant on July 3, 2018, at 8:45 a.m.

During the hearing, Defendant argued that the affidavit included only conclusory allegations that did not rise to the level of probable cause and that the affidavit did not include any information regarding the administration of field sobriety tests or Defendant's behavior at the scene. The State responded that "there has to be a substantial basis that a search would uncover evidence of wrongdoing, which is exactly what happened in this case."

The trial court denied Defendant's motion to suppress, finding that the magistrate had a substantial basis for concluding that the search warrant would uncover evidence of wrongdoing. The court was unaware "of any fact that can be any more objective for a search warrant in a vehicular homicide case than for an officer to allege . . . that an individual was driving the wrong way on a major highway and collided with another vehicle and thereafter smelled of an intoxicant." The court noted that the hearing could have been avoided had the affidavit included the time of the crash and when the officer smelled an odor of an intoxicant emanating from Defendant's person in relation to the timing of the crash. Nevertheless, the court found:

> [T]he affidavit does allege that all of these things happened on Tuesday, July 3rd, 2018. So at whatever time the officer encountered [Defendant] on that same day, after [Defendant] had been traveling the wrong way on 111 and had crashed his vehicle head-on into another vehicle, . . . which reasonably would lead a magistrate to possibly conclude that there was impairment, not only because of the driving on the wrong way, but also because of the inability to avoid oncoming traffic in doing so; that at some point that same day, that [Defendant] also smelled of an intoxicant on his person, from his person, and if it was closer in time, that could be indicative. If it was farther away in time from the accident, that could certainly still be indicative, and arguably, just as incriminating as a time close in time to the accident.

The court found that although the affidavit "could have been more artfully drafted," the information in the affidavit was sufficient to establish probable cause.

On September 13, 2023, Defendant filed a second motion to suppress his blood sample and the results of the analysis, which was heard by the second trial judge. He again

argued that the search warrant affidavit failed to establish probable cause. He also argued that Officer Wright intentionally and/or recklessly omitted material information from the search warrant affidavit in violation of *Franks*. Defendant maintained that Officer Wright should have included in the affidavit that the case involved "an abandoned reckless endangerment investigation"; that while he was booking Defendant for reckless endangerment, "he un-arrested him at the direction of the District Attorney's Office"; that Defendant "acted normally at the scene, called 911, attempted to render aid, spoke clearly, communicated with police and others and in all ways conducted himself in an orderly and sober manner"; that field sobriety tests were not administered to Defendant; and that "DUI was not suspected."

During the October 3, 2023 evidentiary hearing, Officer Wright testified that the crash occurred at approximately 5:40 a.m. and that he arrived at the scene at approximately 6:03 to 6:05 a.m. Because Officer Wright was wearing a body camera, he was instructed by a superior officer to place Defendant under arrest for reckless endangerment and advise him of his rights. Defendant was arrested at approximately 6:50 a.m., and Officer Wright handcuffed Defendant and placed him in the back of a patrol vehicle.

Officer Wright agreed that he had not smelled any alcohol coming from Defendant's person before placing him in the back of the patrol vehicle. Officer Wright explained that they were "around a large fire truck," which smelled of diesel fuel, and that they were "out in the open." After Officer Wright placed Defendant in the back of the patrol vehicle, Officer Wright opened the window that separated the front seat from the back seat and smelled the odor of alcohol coming from the back seat where Defendant was sitting. Officer Wright concluded that the odor was coming from Defendant's person because the odor was not in the vehicle before Defendant entered the vehicle.

Officer Wright said he transported Defendant to the SDPD, where Defendant sat on a bench in the booking room while Officer Wright began completing general jail paperwork. At approximately 7:30 a.m., Officer Wright was instructed to begin preparing a search warrant to obtain Defendant's blood sample, and he stated that this was the first search warrant that he had ever prepared.

Officer Wright agreed that the search warrant affidavit stated that there was probable cause to believe Defendant had committed a DUI, that the language regarding the DUI in the search warrant affidavit was part of the form language, and that he had been instructed to arrest Defendant for reckless endangerment and not DUI. Officer Wright also agreed that he did not have probable cause to arrest Defendant for DUI when Defendant was arrested for reckless endangerment. Officer Wright explained that situations may arise when officers will charge a defendant based off information that they know at that time and then later include additional charges as a result of further investigation. He stated that

officers planned to obtain a blood sample "based on the odor of [an] intoxicant and the admission on the scene to drinking the night before" and that they could charge Defendant with additional offenses based on the results of the blood analysis.

Officer Wright testified that both at the scene and during the 911 call, Defendant stated that he had consumed alcohol during the night before the crash. When Officer Wright prepared the search warrant affidavit, he had not yet listened to the recording of Defendant's 911 call. However, Officer Wright was aware of Defendant's statement made at the scene. Officer Wright agreed that he did not include in the search warrant affidavit that Defendant had called 911 and attempted to render aid to the victim, that Defendant's speech was not slurred, and that no field sobriety tests were given. Officer Wright explained that his role in the investigation did not include giving field sobriety tests and that his role "was to take [Defendant] to the police department and wait for whatever instructions I was given." Officer Wright said he likely would not have given Defendant any field sobriety tests due to the nature of the crash and "the potential for [Defendant] having injury, also." After Defendant's blood was drawn, Officer Wright was informed by a superior officer that a prosecutor from the District Attorney General's Office had instructed them to release Defendant. Officer Wright did not know the reason for Defendant's release, but Officer Wright complied with the instructions and released Defendant.

At the conclusion of the hearing, the trial court made oral findings denying Defendant's motion to suppress. The court found that the search warrant affidavit did not include false statements or material omissions and that although the information in the affidavit was "bare bones," the information was "significant enough to get it on the right side of probable cause."

## B. Probable Cause

Both the United States and Tennessee constitutions protect against unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7; *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). To pass constitutional muster, a search warrant must be issued by a neutral and detached magistrate "upon probable cause," which, in the case of the federal constitution, must be "supported by Oath or affirmation," and must "particularly describe[ ] the place to be searched[ ] and the persons or things to be seized." U.S. Const. amend IV; *see State v. Davidson*, 509 S.W.3d 156, 182 (Tenn. 2016). In addition to the constitutional requirements, Tennessee Code Annotated section 40-6-103 provides that "[a] search warrant can only be issued on probable cause, supported by affidavit, naming or describing the property, and the place to be searched." Tenn. Code Ann. § 40-6-103; *see also* Tenn. R. Crim. P. 41(c)(1), (3)(A) (providing that "[a] warrant shall issue only on an affidavit or affidavits that are sworn before the magistrate and establish the grounds for

issuing the warrant" and that the warrant must "identify the property or place to be searched" and "name or describe the property or person to be seized").

A search pursuant to a warrant based on probable cause is presumptively reasonable. *See State v. Hamm*, 589 S.W.3d 765, 771 (Tenn. 2019) (citing *State v. McCormick*, 494 S.W.3d 673, 678-79 (Tenn. 2016)). "A sworn and written affidavit containing allegations from which a magistrate may determine whether probable cause exists is an 'indispensable prerequisite' to the issuance of a search warrant." *State v. Saine*, 297 S.W.3d 199, 205-06 (Tenn. 2009) (quoting *State v. Henning*, 975 S.W.2d 290, 294 (1998)).

"Probable cause for the issuance of a search warrant exists when, 'given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Aguilar*, 437 S.W.3d 889, 899 (Tenn. Crim. App. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *see State v. Tuttle*, 515 S.W.3d 282, 303-04 (Tenn. 2017). The affidavit "must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized." *Tuttle*, 515 S.W.3d at 300 (citing *Saine*, 297 S.W.3d at 206). "Probable cause is more than a mere suspicion but less than absolute certainty." *Id.* (quoting *State v. Reynolds*, 504 S.W.3d 283, 300 (Tenn. 2016)). The probabilities involved in making the probable cause determination "are not technical" but, instead, are "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Thus, probable cause determinations are "extremely fact-dependent." *Id.* (quoting *State v. Bell*, 429 S.W.3d 524, 534 (Tenn. 2014)).

In determining whether probable cause exists for the issuance of a search warrant, a magistrate must exercise "independent judgment," and the affidavit "must contain more than mere conclusory allegations by the affiant" and must include facts upon which the magistrate may make its commonsense probable cause determination. *Id.* (first citing *State v. Smotherman*, 201 S.W.3d 657, 662 (Tenn. 2006); and then *Henning*, 975 S.W.2d at 294). Given the fact-driven nature of the probable cause determination, a reviewing court must "afford 'great deference' to a magistrate's determination that probable cause exists." *Id.* (citations omitted). The reviewing court "may consider only the affidavit and may not consider other evidence provided to or known by the issuing magistrate or possessed by the affiant." *Henning*, 975 S.W.2d at 295. The reviewing court's duty "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Tuttle*, 515 S.W.3d at 304 (quoting *Gates*, 462 U.S. at 238-39).

A defendant seeking to suppress evidence obtained pursuant to a search warrant has the burden of establishing by a preponderance of the evidence "the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to

the warrant." *Henning*, 975 S.W.2d at 298. The determination of the existence of probable cause is a mixed question of law and fact that this court reviews de novo. *Reynolds*, 504 S.W.3d at 298; *State v. Hardison*, 680 S.W.3d 282, 308 (Tenn. Crim. App. 2023).

In asserting the affidavit failed to establish probable cause, Defendant argues that the affidavit did not include any information regarding Officer Wright's experience in DUI offenses, any field sobriety tests given, Defendant's demeanor and appearance at the crash scene, his speech, his ability to walk, his ability to remove his driver's license from his wallet, or "any of the other hundreds of descriptions that law enforcement officers put in DUI affidavits." Defendant also argues that the affidavit does not include the time during which he consumed alcohol on "the night before this event" or the amount consumed. However, we conclude the inclusion of this information in the affidavit was not necessary to establish probable cause. Instead, viewing the totality of the circumstances set forth in the four corners of the affidavit in a common sense and practical manner, we conclude that the affidavit provided the magistrate with a substantial basis for determining that a sample of Defendant's blood would uncover evidence of DUI.

The affidavit provided that Defendant was traveling north in the southbound lane, resulting in a head-on collision and the death of the driver of the other vehicle. The trial court found this information regarding Defendant's driving indicative of impairment because not only was Defendant driving the wrong way, but he was also unable to avoid oncoming traffic in doing so. This court has recognized that under a commonsense approach to the totality of the circumstances, "we can appropriately recognize certain driving behaviors as sound indicia of drunk driving." *State v. Kroese*, No. M2022-01180-CCA-R3-CD, 2024 WL 2034366, at *14 (Tenn. Crim. App. May 7, 2024) (quoting *Navarette v. California*, 572 U.S. 393, 402 (2014)), *perm. app. denied* (Tenn. Jan. 22, 2025). In *Kroese*, this court concluded that information in an affidavit that "Defendant was driving in the wrong lane of traffic without activated headlights at 4:56 a.m. leading to the head-on collision with the victim" was sufficient to establish probable cause for the issuance of a search warrant for a blood draw. *Id.*; *see Navarette*, 572 U.S. at 402 (concluding that a reliable tip alleging dangerous driving behavior would justify a traffic stop); *State v. Van Camp*, No. E2014-00667-CCA-R3-CD, 2014 WL 7399671, at *5 (Tenn. Crim. App. Dec. 29, 2014) (concluding that a defendant's driving a vehicle in the wrong lane or straddling two lanes was consistent with impaired driving).

In addition to information regarding Defendant's inability to safely operate his vehicle, the affidavit stated that Defendant admitted consuming alcohol on the night prior to the crash and that he smelled of an intoxicant after the crash occurred. The trial court found that it was unaware "of any fact that can be more objective for a search warrant in a vehicular homicide case than for an officer to allege . . . that an individual was driving the wrong way on a major highway and collided with another vehicle and thereafter smelled

- 28 -

of an intoxicant." We agree and conclude that the information in the affidavit about Defendant's driving the wrong way resulting in a head on collision and the victim's death, Defendant's admission of drinking alcohol on the night before the crash, and Officer Wright's smelling of an intoxicant after the crash combined to establish probable cause for the issuance of a search warrant to obtain a blood sample from Defendant. Therefore, the trial court properly denied Defendant's motion to suppress on this basis.

## C. Franks Claim

Defendant asserts that Officer Wright made false statements and omitted material information from his affidavit that would have refuted probable cause. Defendant contends that Officer Wright falsely attested that "there was probable cause for DUI, but later testified, under oath, that he did not have probable cause for DUI." Defendant further contends that Officer Wright omitted from the affidavit that Defendant "acted normally at the scene, called 911, attempted to render aid, spoke clearly, communicated with police and others[,] and in all ways conducted himself in an orderly and sober manner"; that no field sobriety tests were administered; and that Officer Wright "did not smell the odor of alcohol, or see any signs of impairment, during his 1.5 plus hour time with [Defendant] at the [SDPD] after arrest." The State responds that Defendant failed to establish that any *Franks* violations occurred or that he is otherwise entitled to relief. We agree with the State.

A defendant may challenge the veracity of statements included in a search warrant affidavit if the defendant makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard to the truth, included false statements in the affidavit. *See Franks*, 438 U.S. at 155. Our supreme court has recognized "two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made." *State v. Willis*, 496 S.W.3d 653, 721 (Tenn. 2016) (quoting *State v. Little*, 560 S.W.2d 403, 407 (Tenn. 1978)). "Recklessness may be established by showing that a statement was false when made and that the affiant did not have reasonable grounds for believing it, at that time." *Little*, 560 S.W.2d at 407. "Allegations of negligence or innocent mistakes are insufficient to invalidate the search warrant." *Willis*, 496 S.W.3d at 721 (quoting *State v. Yeomans*, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999)). "In order to be 'essential to the establishment of probable cause,' the false or reckless statement must be the only basis for probable cause or if not, the other bases, standing alone, must not be sufficient to establish probable cause." *Id.* (quoting *State v. Norris*, 47 S.W.3d 457, 469 n.4 (Tenn. Crim. App. 2000)). Although some courts have extended the rationale of *Franks* and *Little* to material omissions in the search warrant affidavit, "an affidavit omitting potentially exculpatory information is less likely to present

a question of impermissible official conduct than one which affirmatively includes false information." *State v. Hardison*, 680 S.W.3d 282, 310 (Tenn. Crim. App. 2023) (quoting *Yeomans*, 10 S.W.3d at 297). The defendant has the burden of establishing the allegation of falsity by a preponderance of the evidence. *Tuttle*, 515 S.W.3d at 308 (citing *Yeomans*, 10 S.W.3d at 297); *see Franks*, 438 U.S. at 156.

Our supreme court has recognized that "affidavits for search warrants . . . must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion" because search warrants "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity . . . have no proper place in this arena." *Tuttle*, 515 S.W.3d at 309 (quoting *United States v. Ventresca*, 308 U.S. 102, 108 (1965)). "Hypertechnical judicial review of affidavits 'tends to demean our system of justice and to weaken society's confidence in it.'" *Id.* (quoting *State v. Bishop*, 431 S.W.3d 22, 38 (Tenn. 2014)).

Although Officer Wright testified that he did not have probable cause to arrest Defendant for DUI at the scene, the search warrant affidavit did not state that probable cause to arrest Defendant for DUI existed at that time, contrary to Defendant's claim on appeal. The affidavit stated that Officer Wright had reason to believe that evidence of an intoxicant was in Defendant's blood, "which would serve as evidence of a violation of T.C.A. § 55-10-401 [Driving Under the Influence]," and that the presence of the intoxicant "constitutes critical evidence of a violation of T.C.A. § 55-10-401." This language, when interpreted in "a commonsense and realistic fashion" along with the affidavit as a whole, establishes that officers were investigating whether Defendant committed a DUI offense, that Officer Wright had probable cause to believe that an intoxicant would be present in Defendant's blood, and that Officer Wright was seeking warrant to obtain Defendant's blood sample in furtherance of the DUI investigation. Accordingly, we agree with the trial court's finding that Defendant failed to establish that the affidavit contained a false statement.

Although Defendant claims material information was omitted from the affidavit, he cites to no authority mandating that an officer include all observations of a defendant in an affidavit in support of a search warrant for a defendant's blood sample in furtherance of a DUI investigation. Furthermore, we conclude that given the information in the affidavit that Defendant caused the crash by driving the wrong way, that he admitted drinking alcohol on the night prior to the crash, and that he smelled of an intoxicant following the crash, probable cause for the issuance of the search warrant would have existed even if the omitted information had been included in the affidavit. *See Yeomans*, 10 S.W.3d at 294 (concluding that the defendant was not entitled to relief when probable cause still existed for the issuance of the warrant even if the omitted information had been included in the affidavit). Accordingly, Defendant is not entitled to relief on this issue.

### III.  Admission of Blood Analysis and Retrograde Extrapolation

Defendant challenges the admission of the BAC results and Dr. Ferslew's testimony regarding his retrograde extrapolation of the BAC results.  Defendant contends that the four-hour delay between the crash and the blood draw was unreasonable and that, therefore, the BAC results were unreliable and should have been excluded pursuant to Tennessee Rule of Evidence 403.  Citing Rules 702 and 703, Defendant also contends that Dr. Ferslew's expert testimony regarding his retrograde extrapolation of the BAC results was likewise unreliable.  The State responds that the trial court did not abuse its discretion in admitting the evidence.  We agree with the State.

### *A.  Pretrial Proceedings*

Prior to trial, Defendant filed a "Motion to Suppress Blood Draw Results" in which he argued that the four-hour delay between the crash and the blood draw was unreasonable, rendering the BAC results speculative "for extrapolation purposes."  Defendant attached an affidavit from Ronald Lee Moore, the operator of a private toxicology consulting firm who opined that "predicting the subject's blood alcohol level from a result of 0.02 to a specific estimate four hours earlier is unreliable."  Mr. Moore reasoned that alcohol elimination rates used to conduct retrograde extrapolation varied by individual, that "it is inappropriate to do retrograde extrapolation from BACs of 0.02 and lower," or during the time period in which the individual is in the alcohol absorption phase and prior to the alcohol elimination phase.  The State responded that the four-hour delay was reasonable under the circumstances and that the delay was only one factor to be considered by the jury in weighing the evidence of the BAC results and did not affect its admissibility.

During a hearing before the first trial judge on September 18, 2019, the parties presented arguments consistent with those presented in their respective pleadings but did not present any proof.  The trial court found that it could not render a decision absent the presentation of evidence and continued the hearing until September 25, 2019.

During the September 25 hearing, the State presented Officer Wright, whose testimony at the hearing was consistent with his testimony at trial and other pretrial hearings, and it is not necessary for us to repeat it here.

The trial court took the matter under advisement and issued a written order on November 25, 2019, finding that along with Defendant's admission of drinking alcohol prior to the crash, his BAC of .020 grams percent, although below the per se level of .08 grams percent, served as evidence of Defendant's consumption of alcohol before the crash and was relevant to the issue of Defendant's condition at the time of the crash.  However,

the court also found that "without retrograde extrapolation, a delay of 4 hours between the accident and the BAC test and a BAC result below the *per se* limit significantly diminishes probative value." Thus, the court determined that the BAC results were not admissible absent retrograde extrapolation.

The court compared Mr. Moore's affidavit with a letter from Dr. Ferslew to the prosecutor dated October 16, 2018, in which Dr. Ferslew concluded that based on retrograde extrapolation, Defendant's BAC at the time of the crash was .088 grams percent.[4] The court concluded that additional proof was necessary for a determination of the admissibility of Dr. Ferslew's retrograde extrapolation of Defendant's BAC results. The court concluded that Dr. Ferslew's retrograde extrapolation of Defendant's BAC of .020 grams percent was inadmissible absent "more *pre-trial* information about whether or not and why he shares the other experts' concerns regarding the unreliability of retrograde extrapolation from 0.02% or 0.03% BAC and whether or not and why he recognizes any point at which retrograde extrapolation becomes unreliable."

During an August 17, 2020 hearing, the State presented the testimony of Dr. Ferslew, and the defense stipulated to Dr. Ferslew's qualifications as an expert. Dr. Ferslew stated that retrograde extrapolation was based on alcohol pharmacokinetics, which was established and used by Frederick Widmark in the 1940's to calculate the amount of alcohol necessary to produce a BAC and to determine how that BAC changes over time. Dr. Ferslew explained that retrograde extrapolation, which is generally accepted in the scientific community, is a calculation made once a person is in the alcohol absorption phase to determine how much higher the person's BAC would have been at an earlier time. Dr. Ferslew offered testimony regarding his use of the Widmark formula and the appropriateness of his use of the Widmark formula for a BAC of .020 grams percent that was consistent with his testimony at trial.

Dr. Ferslew testified that he reviewed the toxicology report, the affidavit of complaint and arrest report, and the statements of Defendant and Mr. Taylor. Dr. Ferslew noted that according to TDOT records, Defendant weighed 185 pounds. He stated that Defendant's blood was drawn approximately four hours after the crash and that his BAC was .020 grams percent based on the average of two tests, "plus or minus 0.002 gram percent measurement of certainty at a minimum of 99.73 percent confidence level," which he interpreted as meaning that "99.7 of a hundred measurements are going to be in the range of .0198 to .022" and that if the TBI tested the sample one hundred times, ninety-

---

[4] The trial court noted in its order that the State submitted Dr. Ferslew's letter during the September 25 hearing. However, the letter was not entered as an exhibit during that hearing but was entered as an exhibit during a subsequent hearing.

nine of the results would be .02 grams percent.[5]  He opined that application of the Widmark formula was still proper even when the TBI's error of measurement rate was considered. He stated that "[w]hether you want to think a .0198 is different than a .02 is semantics of the numbers, in my opinion" and that "I would not appreciably make that a distinguishable concentration."  Dr. Ferslew received information that Defendant had stopped drinking alcohol at 1:00 a.m., and based on that information, Dr. Ferslew concluded that Defendant had reached maximum absorption and was in the elimination phase both at the time of the crash and when his blood was drawn.  Dr. Ferslew acknowledged that due to the rate at which alcohol is eliminated, a measurable BAC would not have been detected had officers waited fifteen more minutes before drawing Defendant's blood.

Dr. Ferslew used the following Widmark formula to conclude that Defendant had "a maximum blood alcohol" of .088 grams percent, which was itself an "average" within "a range of .056 to 0.120" that he calculated using the minimum alcohol elimination rate of .009 grams percent per hour and the maximum alcohol elimination rate of .025 grams percent per hour, at the time of the crash:

> .017 (the average alcohol elimination rate per hour) x 4 (the number of hours between the crash and the blood draw) = .068 grams percent + .02 grams percent (Defendant's BAC at the time of the blood draw) = .088 grams percent

Dr. Ferslew used the alcohol elimination rates from *Garriott's Medicolegal Aspects of Alcohol*, a standard text generally accepted in forensic toxicology.

Dr. Ferslew also calculated Defendant's BAC at the time of the crash using anterograde extrapolation, which is a forward calculation based on the weight of the drinker, the amount of alcohol consumed, and the period during which the alcohol was consumed.  Dr. Ferslew said the 185-pound Defendant's consumption of six one-to-three-ounce drinks of bourbon between 9:00 p.m. and 1:00 a.m. would have resulted in a maximum BAC of .103 to .310 grams percent.  Dr. Ferslew concluded that once he considered Defendant's elimination of the alcohol until the time of the crash, "it supports the story of him passing through a .088, reaching a .02, and then having his blood drawn" and that his calculations based on anterograde extrapolation and retrograde extrapolation were "within reason."

---

[5] As the trial court noted in its order, the application of the measurement certainty level would result in a range of .018 to .022 grams percent rather than .0198 to .022 grams percent.  The trial court found that "[a]bsent any post-hearing correction from the [S]tate, the Court presumes that this apparent arithmetic error does not change Dr. Ferslew's opinion regarding the reliability of retrograde extrapolation in this case."

Defense counsel cross-examined Dr. Ferslew extensively regarding his estimation and knowledge of Defendant's weight, the total amount of alcohol consumed, and any food consumed by Defendant and the effect of this information on Dr. Ferslew's calculation based on antegrade extrapolation. Dr. Ferslew stated that he did not need to know Defendant's weight or the total amount of alcohol consumed to calculate Defendant's BAC at the time of the crash based on retrograde extrapolation.

Defendant presented the testimony of Dr. Valentine, whom the State stipulated was an expert in his field. Dr. Valentine agreed with Dr. Ferslew that Defendant was in the alcohol elimination phase at the time of the blood draw. As he did at trial, Dr. Valentine disagreed with Dr. Ferslew's use of the Widmark formula to conduct a retrograde extrapolation to determine his BAC at the time of the crash, saying that even if the Widmark formula could be properly applied to a BAC of .020 grams percent, the application of the TBI's error of measurement rate would place Defendant's BAC below .020 grams percent.

Dr. Valentine said Dr. Ferslew's use of an average elimination rate of .017 grams percent per hour was "okay," but most experts used the average hourly elimination rate of .015 grams percent. Dr. Valentine agreed with Dr. Ferslew's use of .009 grams percent as the minimum hourly elimination rate but disagreed with the use of the average hourly elimination rate or range in the calculations given the lack of information necessary to determine Defendant's exact elimination rate, including when Defendant started and stopped drinking and the amount of alcohol that he had consumed.

Dr. Valentine noted the speculative nature of Dr. Ferslew's anterograde analysis, explaining that the calculation required that Dr. Ferslew make assumptions regarding Defendant's weight and the amount of food and alcohol that Defendant had consumed. Dr. Valentine expressed doubt that the results of Dr. Ferslew's anterograde and retrograde calculations were substantiated by other witnesses' statements regarding Defendant's condition at the scene of the crash. Dr. Valentine testified that he would expect a person with a BAC of .088 grams percent to exhibit some degree of impairment, but Defendant did not appear impaired from the body camera recording of the scene.

At the conclusion of the hearing, the trial court took the matter under advisement and subsequently entered a detailed order on February 3, 2021. The court noted that its initial order did not "condition the admissibility of evidence that a test of the defendant's blood for alcohol was positive on the admissibility of retrograde extrapolation" but did "condition the admissibility of evidence that the defendant's average BAC was 0.02 [grams percent] on the admissibility of retrograde extrapolation." The court found that both the positive test for alcohol and the BAC results corroborated Defendant's admissions of alcohol consumption but that the BAC results, which were more specific, were "perhaps

more likely than the positive test to tempt the jury to engage in its own speculative extrapolation." The court determined that the delay in drawing Defendant's blood was not unreasonable under "the circumstances, including the fatal nature of the accident."

In addressing the admissibility of the expert testimony, the court noted that neither party disputed the qualifications of the other party's expert, and upon reviewing the qualifications of Dr. Ferslew and Dr. Valentine, the court found both qualified as experts on the issue of retrograde extrapolation. The court observed that although the scientific community had differing opinions as to the reliability of retrograde extrapolation, this division did not render evidence of retrograde extrapolation inadmissible in Tennessee. The court reviewed the areas upon which Dr. Ferslew and Dr. Valentine agreed and noted that the experts disagreed regarding "the point or range at which it is reasonable to assume, absent evidence to the contrary for a particular individual, that Widmark kinetics cease to apply and Michaelis-Menten kinetics begin to apply." Thus, the court observed that their disagreement was not "about reliable retrograde extrapolation in general but about reliable retrograde extrapolation from a BAC or an average BAC of 0.020 [grams percent] in particular and in the context of the defendant's apparent lack of impairment at the scene." The court noted the authority upon which each expert relied in reaching his respective opinion and found:

> Although it seems that Dr. Ferslew relies on less recent authority and perhaps less recent research than Dr. Valentine and, while acknowledging individual differences, does not let the defendant's apparent lack of impairment at the scene keep him from applying Widmark kinetics, it appears that both Dr. Ferslew's retrograde extrapolations from the defendant's average BAC of 0.020 [grams percent] and Dr. Valentine's critique thereof have scientific validity, *i.e.*, a basis in observational data.

In examining methodological reliability, the court stated that although Dr. Ferslew and Dr. Valentine disagreed regarding the point or range at which "Widmark kinetics cease to apply and Michaelis-Menten kinetics apply," they agreed to the methodology of retrograde extrapolation when Widmark formula applied. The court noted that when the individual's actual hourly alcohol elimination rate is unknown, the formula to be used required either the average hourly elimination rate or the "range of possible hourly elimination rates." The court found that because Dr. Ferslew made calculations based on the average hourly elimination rate and as a range using the minimum and maximum hourly elimination rates, "the extrapolations have methodological reliability."

In addressing foundational reliability, the court expressed concern regarding portions of both expert's testimony regarding the effect of the TBI's testing Defendant's blood sample twice and reporting his BAC at .020 grams percent as an average of the two

tests on the retrograde extrapolation calculations. The court concluded that because "the experts mostly agree [to] the relevant authorities and facts, including the defendant's average BAC and the existence of a range of possible elimination rates," Dr. Ferslew's retrograde extrapolation calculations from Defendant's average BAC also had sufficient foundational reliability.

The court stated that it was "not without reservations about Dr. Ferslew's retrograde extrapolations" and that "retrograde extrapolation is at the limit of reliability in this case." However, the court found that the disagreements between the two experts presented an issue regarding the weight of the evidence and not its admissibility. The court noted that fairness to Defendant required cross-examination of Dr. Ferslew at trial, the admission of Dr. Valentine's "critique" of Dr. Ferslew's opinion, and "precision" in Dr. Ferslew's testimony. The court described Dr. Valentine's belief that the scientific community did not favor retrograde extrapolation using the average alcohol elimination rate as "understandable," explaining,

> To state a retrograde extrapolation on the basis of an average elimination rate as a single value instead of a range of values or to suggest that there is no reason not to believe that the average elimination rate is the actual elimination rate . . . seems to the Court to contradict the premise of the methodology that the actual elimination rate is unknown and to disregard the variations between individuals and in the same individual at different times, even to confuse the defendant with the hypothetical average person. As a consequence, it is insufficiently precise and misleading.

The court found that stating Defendant's BAC as a range following retrograde extrapolation rather than as a single value was sufficient to convey the possibility that Defendant's BAC at the time of the crash was at or above .080 grams percent or that "more of the extrapolation range" falls at or above .080 grams percent than below .080 grams percent.

Accordingly, the court denied Defendant's motion to exclude the test results of his blood sample and the retrograde extrapolation of those results

> on the condition that the prosecutor and the prosecution expert consistently state the retrograde extrapolation as a range of values, not a single value, and do not suggest without knowledge of the defendant's actual elimination rate that the defendant's actual elimination rate was the average elimination rate and the condition that the prosecutor and the prosecution expert do not misstate the measurement uncertainty and confidence level[.]

Shortly before trial, Defendant again moved to exclude the evidence or, in the alternative, exclude Dr. Ferslew's testimony regarding anterograde extrapolation, limit Dr. Ferslew's testimony to the BAC range of .056 to .088 grams percent based on his retrograde extrapolation calculations, and limit Dr. Ferslew's description of the range as "the average range for an average person" rather than Defendant's range since Defendant's alcohol elimination rate was unknown. Following a hearing on the morning of trial, the trial court excluded Dr. Ferslew's testimony regarding antegrade extrapolation. The court determined that based on the trial court's prior order, Dr. Ferslew would be allowed to testify that Defendant's BAC at the time of the crash was .056 to .120 grams percent and that Dr. Ferslew must clarify that his calculations were based on the average alcohol elimination rates because Defendant's actual elimination rate was unknown.

## B. Delay in Drawing Defendant's Blood

Defendant contends that the four-hour delay between the crash and the blood draw was unreasonable, rendering the BAC results unreliable and inadmissible pursuant to Tennessee Rule of Evidence 403. The State responds that the four-hour delay was not unreasonable due to the circumstances of the crash and the conflicts of interest arising from Defendant's relationships with officers and emergency personnel.

Relevant evidence is any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. Even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "Excluding relevant evidence under [Rule 403] is an extraordinary remedy that should be used sparingly, and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion." *State v. James*, 81 S.W.3d 751, 757-58 (Tenn. 2002) (quoting *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)). Questions of evidentiary relevance, including the exclusion of relevant evidence under Rule 403, lie within the discretion of the trial court, and this court will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

This court has recognized that the results of "a proper blood alcohol test administered at a reasonable time after the defendant has been driving" is circumstantial evidence upon which the jury may rely in convicting the defendant of DUI, *see State v. Greenwood*, 115 S.W.3d 527, 532-33 (Tenn. Crim. App. 2003), and "has repeatedly refused to set a bright line rule as to what constitutes 'a reasonable time after the defendant

has been driving,'" *see State v. Ralph*, 347 S.W.3d 710, 716 (Tenn. Crim. App. 2010) (citing cases). "Any delay between driving and testing may be considered by the trier of fact as to the weight to be given the test." *Ralph*, 347 S.W.3d at 716 (quoting *Greenwood*, 115 S.W.3d at 533). Based on these principles, this court has upheld alcohol-related driving convictions when the blood draw occurred several hours after the defendant was involved in a motor vehicle crash or was otherwise stopped by police. *See State v. Bridges*, No. E2019-01003-CCA-R3-CD, 2021 WL 928467, at *9 (Tenn. Crim. App. Mar. 11, 2021) (less than two hours between the stop and the blood draw); *State v. Dickey*, No. W2005-00722-CCA-R3-CD, 2005 WL 3533325, at *3 (Tenn. Crim. App. Dec. 22, 2005) (approximately two hours between the crash and the blood draw); *State v. Blake*, No. W2004-01253-CCA-R3-CD, 2005 WL 1467907, at *1, *5-6 (Tenn. Crim. App. June 21, 2005) (the crash occurred after 5:00 a.m. and the blood draw occurred at 10:50 a.m.).

In challenging the four-hour delay as unreasonable, Defendant relies on a 2005 amendment to Tennessee Code Annotated section 55-10-406(a)(1), which provided that for the results of a blood test or tests "to be admissible as evidence, it must first be established that all tests administered were administered to the person within two (2) hours following each person's arrest or initial detention." Tenn. Code Ann. § 55-10-406(a)(1) (Supp. 2005). However, the statute was subsequently amended to remove this provision, effective January 1, 2009, almost ten years before the offenses occurred in the instant case. *See* Tenn. Code Ann. § 55-10-406(a)(1) (Supp. 2009). Accordingly, the 2005 statutory provision does not apply to preclude the admission of the Defendant's BAC results.

During the pretrial hearing, the State presented detailed evidence regarding the investigation and the delays leading to the blood draw. Officer Wright testified regarding the tasks performed leading up to his preparing the search warrant, the challenges in preparing the search warrant due to his inexperience, the fire department employee's declining to draw Defendant's blood due to a conflict of interest once a judge signed the warrant, his difficulty in locating an unexpired blood kit, and his transporting Defendant to the county jail for the blood draw. Officer Wright provided the approximate times during which each event occurred. The trial court concluded that the delay in the blood draw was not unreasonable under "the circumstances, including the fatal nature of the accident."

Recognizing that the four-hour delay and the fact that the BAC result was less than the *per se* amount "significantly diminishes the probative value" of the evidence as proof of intoxication absent retrograde extrapolation, the trial court carefully weighed the probative value of the evidence against its prejudicial effect and conditioned the admissibility of evidence that Defendant's BAC was .020 grams percent four hours after the crash on the admissibility of the retrograde extrapolation of the result to the time of the crash. The evidence does not preponderate against the trial court's findings. Furthermore, Defendant cross-examined the witnesses extensively at trial regarding the circumstances

of the delay and his condition following the crash and used these facts to argue that the jury should afford the BAC test results no weight. *See Greenwood*, 115 S.W.3d at 533 ("Any delay between driving and testing may be considered by the trier of fact as to the weight to be given the test."). Therefore, we conclude that the trial court did not abuse its discretion in declining to exclude the BAC results based on the delay and, instead, placing conditions on the admissibility of the evidence. Defendant is not entitled to relief on this issue.

## C. *Retrograde Extrapolation*

Defendant challenges the trial court's admission of Dr. Ferslew's testimony regarding retrograde extrapolation, arguing that Dr. Ferslew's application of the Widmark formula to a BAC of .020 grams percent was unreliable. Defendant also maintains that the facts upon which Dr. Ferslew relied were unreliable because of the four-hour delay and the TBI's error rate. The State responds that the trial court properly exercised its discretion in admitting the evidence.

Trial courts serve as "gatekeepers" regarding the admissibility of expert testimony. *State v. Scott*, 275 S.W.3d 395, 401 (Tenn. 2009) (first citing *State v. Copeland*, 226 S.W.3d 287, 300-01 (Tenn. 2007); and then *Johnson v. John Hancock Funds*, 217 S.W.3d 414, 425 (Tenn. Ct. App. 2006)). The trial court's role "is to ensure that 'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 275 (Tenn. 2005) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). In determining the admissibility of expert testimony, "trial courts are not empowered to choose between legitimate competing expert theories by excluding the lesser of the two. To the contrary, that task must be left to the trier of fact." *Scott*, 275 S.W.3d at 402 (first citing *State v. Farner*, 66 S.W.3d 188, 207-08 (Tenn. 2001); and then *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997)).

The party seeking to admit expert testimony is not required to establish that the testimony is correct but only that the testimony "rests upon good grounds." *Id.* (citations omitted). When the expert testimony rests upon good grounds and even if the trial court believes better grounds for an alternative conclusion exists, "the proffered expert testimony 'should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.'" *Id.* (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

The trial court "must assure itself that the [expert's] opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *Scott*,

275 S.W.3d at 402 (quoting *McDaniel*, 955 S.W.2d at 265). Our supreme court has identified "four general inter-related components" to be considered in the court's reliability analysis: "(1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability." *Id.* Defendant concedes that Dr. Ferslew was qualified by "knowledge, skill, experience, training, or education to express an opinion within the limits of his . . . expertise" but challenges the other three components. *Id.* (citing *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002)).

Analytical cohesion requires consideration of "whether the 'basis for the witness's opinion, *i.e.*, testing, research, studies, or experience-based observations, adequately supports that expert's conclusions' to ensure that there is not a significant analytical gap between the expert's opinion and the data upon which the opinion is based." *Id.* (quoting *Stevens*, 78 S.W.3d at 834-35). The inquiry into methodological reliability "focuses upon the reliability of the methodology employed by the expert." *Id.* at 403. To determine foundational reliability, the court must first "assess the expert's field or discipline itself by focusing on the reliability of the studies, articles, and data that compose the field and that provide the underlying foundation for the expert's testimony" and then "analyze the reliability of the underlying facts or data upon which the expert's opinion is predicated." *Id.* (citing Tenn. R. Evid. 703). When examining methodological and foundational reliability, the court should consider:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*Id.* at 403-04 (citing *McDaniel*, 955 S.W.2d at 265). The trial court need not rigidly apply these factors, and some expert testimony may not "fit" within these factors. *Id.* at 404 (first citing *Copeland*, 226 S.W.3d at 302; and then *Brown*, 181 S.W.3d at 277). Ultimately, "the exact considerations that may be appropriate will vary depending upon 'the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony.'" *Id.* (quoting *Brown*, 181 S.W.3d at 277). The admission or exclusion of expert testimony rests within the sound discretion of the trial court, and this court will not reverse the trial court's determination absent an abuse of discretion. *Id.* at 402.

Retrograde extrapolation "involves the use of scientific evidence to relate the blood alcohol level at the time of testing back to the time of operation of the vehicle." *Greenwood*, 115 S.W.3d at 531 (citing E. John Wherry, Jr., *The Rush to Convict DWI Offenders: The Unintended Unconstitutional Consequences*, 19 Dayton L. Rev. 429, 449

(1994)). Defendant does not challenge the reliability of retrograde extrapolation in general but challenges the reliability of Dr. Ferslew's retrograde extrapolation calculations under the facts and circumstances of this case.

This court has noted that "[t]he greatest concern regarding the reliability of expert extrapolation evidence arises from the individual variations in alcohol absorption rates." *State v. Scott*, No. M2006-02067-CCA-R3-CD, 2008 WL 4253722, at *17 (Tenn. Crim. App. Sept. 17, 2008) (citing Kimberly S. Keller, *Sobering Up Daubert: Recent Issues Arising in Alcohol-Related Expert Testimony*, 46 S. Tex. L. Rev. 111, 123 (2004)). Dr. Ferslew and Dr. Valentine agreed that Defendant was in the elimination phase at the time of the blood draw. The "majority of experts agree that the potential for error increases significantly when an attempt is made to extrapolate blood alcohol levels back more than one hour," but "[d]espite these concerns, many courts have admitted expert proof of retrograde extrapolation." *Id.* (citing cases).

Here, the trial court made detailed findings, considered the applicable factors for admission of expert testimony, and limited Dr. Ferslew's potential testimony at trial. Both experts agreed with the reliability of retrograde extrapolation in general, Defendant's average BAC at the time of the blood draw as reported by the TBI, the range of possible alcohol elimination rates, and the methodology of retrograde extrapolation when Widmark kinetics applied. Both experts relied on recognized authority in their field in reaching their opinions, and the opinions of both experts had scientific validity. Their disagreement centered on whether Dr. Ferslew's retrograde extrapolation of Defendant's BAC using the Widmark formula was reliable.

The trial court expressed concern about Dr. Ferslew's use of the average alcohol elimination rate to calculate a specific BAC at the time of the crash in the absence of evidence that Defendant's actual alcohol elimination rate was equal to the average rate and, thus, ruled that he would only be permitted to testify to Defendant's estimated BAC at the time of the crash as a range calculated using the scientifically recognized minimum and maximum hourly elimination rates. Dr. Ferslew's testimony complied with the court's order. *See Scott*, 2008 WL 4253722, at *18 (concluding trial court did err by admitting Dr. Ferslew's retrograde extrapolation calculation using the average elimination rate when Dr. Ferslew's opinion was based on "an assumed average elimination rate developed from scientific research" and he made clear that his opinion was an estimate).

Defendant contends the trial court should have limited Dr. Ferslew's testimony about the estimated BAC range to .056 to .088 grams percent because Dr. Ferslew testified during the pretrial hearing that Defendant's "maximum" BAC at the time of the crash was .088 grams percent. However, as the trial court noted in its order, Dr. Ferslew later clarified at the pretrial hearing that Defendant's BAC at the time of the crash was "[o]n average,"

.088 grams percent with a range of .056 to .120 grams percent "depending on his rate of elimination."

Defendant also challenges the reliability of Dr. Ferslew's testimony due to the delay in the blood draw, the TBI's standard rate of measurement, and evidence of Defendant's conduct at the scene, which Defendant maintains was inconsistent with intoxication. Both experts testified about the impact of these circumstances on their respective opinions, and the trial court determined that these circumstances did not render Dr. Ferslew's opinion unreliable. These circumstances relate to the weight of Dr. Ferslew's testimony and not its admissibility. *See Scott*, 275 S.W.3d at 409 ("Where the expert's testimony is otherwise reliable and experts in the field would reasonably rely upon such evidence, concerns are more properly addressed through vigorous cross-examination rather than by exclusion of the testimony.").

The record reflects the trial court carefully considered the bases upon which each expert relied and limited Dr. Ferslew's testimony using the standards for the admissibility of expert testimony set forth by our supreme court. The remaining testimony that the trial court deemed admissible involved a classic "battle of the experts" with both experts presenting legitimate competing expert theories that rested upon "good grounds." *See id.* at 404. Our supreme court has made clear that in such situations, the trier of fact determines which expert theory to accredit and how much weight to be afforded to any expert theory. *See id.* Thus, we conclude that the trial court did not abuse its discretion in admitting Dr. Ferslew's limited testimony.

## IV. Admission of Mr. Smith's Lay Opinion Testimony

Citing Tennessee Rules of Evidence 701 and 403, Defendant contends that the trial court erred by allowing Mr. Smith to testify about the roadway and the presence of indicators to alert wrong way drivers because it was improper lay opinion. The State responds that the trial court did not abuse its discretion because Mr. Smith's testimony was "confined to that of a lay witness, and not an expert."

Prior to trial, Defendant moved to exclude Mr. Smith's testimony and an accompanying photograph of the roadway as irrelevant pursuant to Rule 401 and unfairly prejudicial pursuant to Rule 403. During a pretrial hearing, Defendant argued that Mr. Smith had no personal knowledge about the crash and that the State was attempting to use Mr. Smith's testimony to "basically backdoor in an accident reconstructionist." The State maintained that Mr. Smith, a TDOT employee, was not offered as an accident reconstructionist or to provide an expert opinion but that he would testify about the appearance of the roadway, the markings on the roadway, and the reason for the markings.

The trial court found that the proposed testimony did not call for an expert opinion and that "the State can call whoever they want to provide lay testimony."

At trial, the State sought to admit through Mr. Smith photographs of the interchange on which Mr. Smith had labeled yellow lines and other indicators that a driver is traveling the wrong way. Defendant objected, arguing that the labels were the equivalent of expert testimony. The trial court overruled Defendant's objection, finding that Mr. Smith's labeling the photographs did not amount to expert testimony and that Mr. Smith's preparing the exhibits prior to trial was no different than his marking photographs of the scene while testifying at trial.

A non-expert witness may give testimony in the form of an opinion or inference if it is "rationally based on the perception of the witness" and "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). A witness's lay opinion is admissible when the jury cannot readily draw its own conclusions on the issue without the witness's lay opinion or when the witness cannot effectively testify without stating the inference or opinion. *State v. Schiefelbein*, 230 S.W.3d 88, 130 (Tenn. Crim. App. 2007). Lay opinion testimony should be within the range of knowledge or understanding of ordinary laypeople and based on admissible facts that are in evidence. *State v. Boggs*, 932 S.W.2d 467, 474 (Tenn. Crim. App. 1996). "If an opinion is based upon a lay witness's own observations, his or her conclusions require no expertise and are within the range of common experience, the opinion is admissible." *State v. Samuel*, 243 S.W.3d 592, 603 (Tenn. Crim. App. 2007). "The distinction between an expert and a non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992), *superseded by statute as stated in State v. Reynolds*, 635 S.W.3d 893 (Tenn. 2021); *see State v. Cook*, No. W2012-00406-CCA-R3-CD, 2013 WL 9570493, at *8 (Tenn. Crim. App. Sept. 4, 2013) (listing examples of lay testimony). We review the trial court's decision regarding the admissibility of opinion evidence for an abuse of discretion. *Schiefelbein*, 230 S.W.3d at 130.

We agree with the trial court that the presence or absence of signs or other markings to indicate that a driver that is traveling the wrong way down a roadway is not a matter that requires expert testimony and instead falls within the common knowledge of the general public. Mr. Smith's testimony was both rationally based on his perception and "helpful to a clear understanding of . . . the determination of a fact in issue." Tenn. R. Evid. 701(a). Furthermore, Mr. Smith's preparation of a visual aid to illustrate his testimony did not convert his lay testimony into expert testimony. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

Defendant argues that Mr. Smith's testimony extended beyond permissible lay testimony. In response to the State's question about why no wrong-way or do-not-enter signs were posted around the interchange, Mr. Smith replied, "They're not called for by the standard. And the orientation of the road is not such that someone could—[.]" The record reflects that Defendant objected to the testimony, arguing the State's question called for an expert opinion. During a bench conference, the trial court agreed with Defendant, sustained his objection, and set forth the parameters for the State's further questioning of Mr. Smith. Defendant did not request a curative instruction or ask for a mistrial. Mr. Smith also testified on redirect examination that signs are installed in different areas based on the chances of a driver traveling the wrong way, that the area around the interchange was "a controlled access facility," and that "there are no signs there because the only way you can get a wrong-way driver is to make a 180-degree turn. Whereas, on a non-controlled access facility, you could make a 90-degree turn and go the wrong way." However, Defendant does not challenge this testimony on appeal. Accordingly, we conclude that Defendant has failed to establish that the trial court abused its discretion.

Regardless, we further conclude that any error in the admission of evidence regarding the standards for inclusion or exclusion of do-not-enter or wrong-way signs was harmless. *See* Tenn. R. App. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). Other evidence presented at trial established that Defendant made a U-turn and began driving the wrong way, that there were markers on the roadway indicating to Defendant that he was driving the wrong way, and that Defendant caused the crash not only by driving the wrong way but also by swerving into the victim's lane and to the shoulder of the roadway, crashing into the victim's vehicle. The evidence also established that Defendant admitted drinking alcohol on the night prior to the crash, smelled of alcohol after the crash, had a measurable BAC four hours after the crash, and had a BAC range of .056 to .120 grams percent at the time of the crash. Considering the strong evidence supporting Defendant's convictions, we cannot conclude that any error in the admission of Mr. Smith's testimony "more probably than not affected the judgment" or "result[ed] in prejudice to the judicial process." *Id.* Defendant is not entitled to relief on this issue.

## V. The Jury's Visit to the Scene

Defendant contends that the trial court erred in granting the State's motion to allow the jury to view Defendant's driving route and the scene of the crash under conditions that were not similar to the conditions that existed at the time of the crash. He argues that although the southbound lanes were closed to traffic during the jury's viewing, the northbound lanes remained open and that as a result, the traffic conditions did not mimic

the amount of traffic in the area at the time of the crash. Defendant maintains that the trial court erred by allowing the jury to view the area without his consent and absent a hearing on the validity of the jury's viewing the area under different traffic conditions. The State responds that the trial court acted within its discretion in permitting the jury to view Defendant's route and the scene of the crash "despite the imperfect conditions."

Prior to trial, the State moved to allow the jury to visit the crash scene and view the route taken by Defendant, maintaining that the video and photographic evidence was inadequate to demonstrate to the jury how the offenses occurred. During a pretrial hearing, defense counsel consented to the viewing but noted the need to ensure that it occurred when the conditions were similar to those at the time of the crash. Defendant acknowledges in his brief that the parties ultimately agreed that the roads would be closed and that the jury viewing would occur in the dark, "mimicking the dark, limited traffic occurring around 5:40 a.m." on the date of the crash.

The jury viewing was scheduled for October 25, 2023, at 7:00 p.m. At 4:30 p.m., the trial court contacted the parties via text message and stated that he had learned from law enforcement that there was insufficient manpower to shut down both the northbound and southbound traffic and that only the southbound traffic on Highways 111 and 27, the same direction that Defendant was traveling at the time of the crash, would be shut down. During a text message exchange, defense counsel objected, arguing that the existence of northbound traffic would result in a situation that was "completely different than it was on July 3 at 5:40 am with no traffic." Defense counsel maintained that "[t]here will be cars and lights and there is no way for us to address that. The jury can't unsee that." The trial court responded that it believed there would be intervals during which no traffic would be on the northbound side, "creating a situation where the jury will see how dark the highway appears without traffic." The State suggested the court instruct the jury that there likely would have been less oncoming traffic on the morning of the offense, and the trial court agreed. Defense counsel said that "[t]weaking" the jury instructions would be "helpful" but insufficient to cure the problem and asked to place his objection on the record. The trial court stated that a court reporter would be present during the jury's viewing and that defense counsel would be allowed to place his objection on the record before the jury traveled to the scene. Although the record does not reflect that Defendant placed his objection on the record prior to the jury's traveling to the scene, the trial court subsequently ordered that the appellate record be supplemented with the text message exchange.

The record reflects that the jury was taken to Mr. Taylor's home, the area where Defendant made the U-turn, and the crash scene. The trial court initially instructed the jury:

[C]onditions this evening will not perfectly mirror those of that particular morning. Some things along the route may have changed over time. This includes possible routine repair work to the roads, differences in vegetation from July till late October, and variations in lighting. For example, there may be evening lighting from areas nearby, which may create ambient light that was not present during the early morning hours of July the 3rd. Additionally, traffic conditions may differ. Traffic volume would be different at 7:30 in the evening than it would have been at 5:40 in the morning on July the 3rd. You must take all these differences into account.

The court further instructed the jurors that their "primary guide" must be the testimony of the witnesses and "not the conditions you observe during this view. The purpose of this exercise is not to recreate exactly what happened on the morning of July 3rd; instead, this viewing is designed to provide you with a general understanding of places, relative distances, relationships." The court stated that the "actual proof" for the jury's consideration was "the testimony and exhibits provided in court from the witness stand" and that "[t]his exercise is strictly to aid your understanding of special relationships and nothing more." The court asked the jurors to indicate their understanding of the instructions by raising their hands, and the court noted each juror raised his or her hand. At both the area of the U-turn and the crash, the court instructed the jury that there would have been "little to no northbound traffic" on the morning of July 3, 2018.

This court has recognized that "[i]t is within the trial court's discretion to allow the jury to view a crime scene." *State v. Yokley*, No. E2009-02646-CCA-R3-CD, 2011 WL 2120096, at *30 (Tenn. Crim. App. May 20, 2011). Defendant argues that the trial court was not authorized to allow the jury to view the scene absent the consent of both parties. Defendant relies on this court's opinion in *State v. Shaw*, wherein we stated, "Although the weight of authority holds that unless a view is prohibited, the taking of a view rests in the sound discretion of the court, we have Tennessee authority indicating that the court should have consent by both parties before exercising its discretion on granting a view." *State v. Shaw*, 619 S.W.2d 546, 548 (Tenn. Crim. App. 1981). However, this court later clarified that "a careful reading of the authorities cited in *Shaw*" indicating that consent is required "discloses that the reference is to a view by the jury sua sponte and without authorization. In our opinion, the general rule prevails in our state[,] and the judge will grant or deny the application of either party in the exercise of a sound discretion." *State v. Andrews*, No. 87-134-III, 1987 WL 27514, at *3 (Tenn. Crim. App. Dec. 15, 1987). This court has since concluded that a trial court did not abuse its discretion in granting the State's motion to allow the jury to view a crime scene despite the defendant's objection. *See Yokley*, 2011 WL 2120096, at *30-31. Accordingly, we will review this issue to determine whether the trial court abused its discretion.

Defendant asserts that the trial court failed to grant him a hearing on the State's motion. During the initial hearing on the State's motion, Defendant agreed to the jury viewing. Defendant objected after the trial court informed the parties via text message that law enforcement was unable to shut down traffic in the northbound lanes, and the court stated that defense counsel would be given the opportunity to place his objection on the record. Although the record does not reflect why this was not done, the court entered an order supplementing the record with the text message exchange containing defense counsel's objection and the basis for his objection. On appeal, Defendant does not identify any arguments he was prevented from making due to the lack of an additional hearing at trial. Thus, Defendant has failed to establish that he is entitled to relief on this issue.

Defendant's lone objection to the jury viewing was the failure to close traffic in the northbound lanes. The trial court concluded that a limiting instruction to the jury was sufficient to alleviate Defendant's concerns and twice instructed the jury that there was "little to no northbound traffic" on the morning of the crash. The court also warned the jurors of the limited role that their observations at the scene could play in its verdict, emphasizing that the "actual proof" was "the testimony and exhibits provided in court from the witness stand." The jury is presumed to have followed the trial court's instructions. *See State v. Inlow*, 52 S.W.3d 101, 106 (Tenn. Crim. App. 2000); *see also State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998) ("It is an elementary principle of law that jurors are presumed to follow the instructions of the trial court."). We conclude that the trial court did not abuse its discretion in allowing the jury to view the scene while also issuing the limiting instructions.

## VI. Jury Instructions

Defendant asserts that the trial court erred by including the optional "voluntary intoxication" language from the pattern jury instructions on reckless vehicular homicide, by including language regarding voluntary intoxication in the instructions on ignorance or mistake of fact, and by failing to specify the mental states to which mistake of fact applied. The State responds that the trial court properly instructed the jury.

When defining recklessness as an element of vehicular homicide by intoxication, reckless vehicular homicide, and vehicular assault, the trial court instructed:

> [A] person acts recklessly with respect to circumstances surrounding or the result of his conduct when the person is aware of, but consciously disregards, a substantial and unjustifiable risk either that the particular circumstance exists or the particular result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard

of care that an ordinary person would exercise under the circumstances as viewed from the accused person's standpoint.

The court further instructed that "[i]f recklessness establishes an element of an offense and the person is unaware of a risk because of voluntary intoxication, the person's unawareness is immaterial in a prosecution for that offense." *See* Tenn. Code Ann. § 39-11-503(b). The court defined "voluntary intoxication" as "intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known."

The trial court granted Defendant's request for an instruction on ignorance or mistake of fact, but the court added language to the pattern jury instruction that the ignorance or mistake of fact cannot result from voluntary intoxication. The court instructed:

> Included in the defendant's plea of not guilty is his plea that his acts constituting the offense charged were the result of ignorance or mistake of fact. Ignorance or mistake of fact is a defense to the prosecution if such ignorance or mistake of fact negates the culpable mental state of a charged or an included offense. Ignorance or mistake of fact is not a defense to prosecution if such ignorance or mistake of fact results from voluntary intoxication.

> "Voluntary intoxication" means intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known.

> In this case, the State must prove beyond a reasonable doubt the required culpable mental state of the defendant.

> Although the defendant's ignorance or mistake of fact may constitute a defense to the charge or an included offense, the defendant may be convicted of the offense for which the defendant would be guilty if the facts were as the defendant believed.

> Ignorance or mistake of fact of law is never a defense to prosecution.

> If evidence is introduced supporting the defense of ignorance or mistake of fact, the burden is on the State to prove beyond a reasonable doubt that the defendant did not act through ignorance or mistake of fact.

- 48 -

If from all the facts and circumstances you find the defendant acted through ignorance or mistake of fact, or if you have a reasonable doubt as to whether the defendant acted through ignorance or mistake of fact, you must find him guilty.

"It is well-settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Dorantes*, 331 S.W.3d at 390. Thus, "[t]he trial court has the duty to provide a complete charge of the law applicable to the facts of a case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial." *State v. Anderson*, 985 S.W.2d 9, 17 (Tenn. Crim. App. 1997). When reviewing the adequacy of a particular jury instruction, this court must review the instruction in the context of the whole charge rather than in isolation. *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). Before reversing a conviction based on an erroneous jury instruction, this court "must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *James*, 315 S.W.3d at 446 (citations omitted). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." *Clark*, 452 S.W.3d at 295 (first citing *State v. Hawkins,* 406 S.W.3d 121, 128 (Tenn. 2013); and then *Nye v. Bayer Cropscience, Inc.*, 347 S.W.3d 686, 699 (Tenn. 2011)).

We note that Defendant did not raise the trial court's inclusion of the voluntary intoxication language in defining recklessness as an issue in his motion for new trial. To preserve a challenge to an erroneous or inaccurate jury instruction for appeal, the defendant must raise the issue in his motion for new trial. *See Faulkner*, 154 S.W.3d at 58; *see also* Tenn. R. App. P. 36(a). By failing to raise the issue in his motion for new trial, Defendant has waived plenary appellate review. Because Defendant does not request plain error review, we decline to address this issue as plain error. *See State v. Nelson*, 275 S.W.3d 851, 864 (Tenn. Crim. App. 2008) ("Appellate courts are advised to use plain error sparingly in recognizing errors that have not been raised by the parties or have been waived due to a procedural default.") (citing *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007)).

Defendant notes that the pattern jury instruction on ignorance or mistake of fact indicates that the charged offenses and specific mental states should be included by the trial court in instructing the jury, if applicable. Tennessee Criminal Pattern Jury Instruction 40.01 provides in relevant part:

Ignorance or mistake of fact is a defense to prosecution if such ignorance or mistake negates the culpable mental state of the *[charged][included]* offense.

In this case, the state must prove beyond a reasonable doubt the required culpable mental state of the defendant which is [insert definition of specific mental state required for charged and included offenses].

Although a defendant's ignorance or mistake of fact may constitute a defense to the offense *[charged][included]*, the defendant may be convicted of the offense for which the defendant would be guilty if the fact were as the defendant believed.

However, the trial court instructed the jury that "[i]gnorance or mistake of fact is a defense to prosecution if such ignorance or mistake of fact negates the culpable mental state of a charged or an included offense." *See* Tenn. Code Ann. § 39-11-502(a) (2018) (providing that "ignorance or mistake of fact is a defense to prosecution if the ignorance or mistake negates the culpable mental state of the charged offense"); *see also State v. Ruiz*, 716 S.W.3d 439, 451 (Tenn. Crim. App. 2024) (holding that the mistake of fact defense "applies only to negate a culpable mental state. As such, where the essential elements of a crime do not include a culpable mental state, a mistake of fact defense simply has no application"). Prior to instructing the jury on ignorance or mistake of fact, the trial court instructed the jury on the elements of each charged offense and each applicable lesser-included offense, and the court's instructions on the elements of each offense identified those offenses with culpable mental states. *See Ruiz*, 716 S.W.3d at 448, 451 (identifying "traffic offenses" and DUI as strict liability offenses that do not have culpable mental states and concluding that the mistake of fact defense is not applicable to strict liability offenses). Thus, the jury instructions, when viewed as a whole, identified those charges with culpable mental states to which the mistake of fact defense may be applied. Defendant is not entitled to relief on this issue.

Defendant also challenges the trial court's addition of language to the pattern jury instruction that "[i]gnorance or mistake of fact is not a defense to prosecution if such ignorance or mistake of fact results from voluntary intoxication." The court expressed concern that without the language, the jury could believe that if Defendant "made a mistake at any point driving, then he's off the hook" even if the mistake was due to intoxication. In an effort to negate the mental state of recklessness for the vehicular homicide offenses, Defendant argued at trial that his making a U-turn and traveling the wrong way was a mistake of fact brought about by the confusing nature of the roadway and lack of adequate warning in the area, and the State argued that there were more than sufficient warnings in the area and that Defendant's driving was due to his intoxication. By statute, voluntary

intoxication cannot be relied upon to negate the mental state of recklessness. *See* Tenn. Code Ann. § 39-11-503(b). To recognize a mistake of fact defense to an offense with a reckless mental state based solely on a defendant's voluntary intoxication would effectively allow an end run around the prohibition of the use of voluntary intoxication to negate recklessness. We conclude that the additional language in the jury instruction is a correct statement of the law and that Defendant, therefore, is not entitled to relief on this issue.

## VII. Cumulative Error

Defendant maintains that the cumulative effect of the errors at trial warrant reversal of his convictions. The cumulative error doctrine recognizes "that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010); *see State v. Leath*, 461 S.W.3d 73, 116 (Tenn. Crim. App. 2013). Defendant has failed to establish any error or series of errors at trial that warrant reversal of his convictions when considered individually or cumulatively. Accordingly, he is not entitled to relief under the cumulative error doctrine.

## VIII. Coram Nobis Relief

Both parties challenge the trial court's order on Defendant's petition for writ of error coram nobis in which the court granted relief on Defendant's convictions for vehicular homicide by intoxication and DUI and denied relief as to his other convictions. The State asserts that the trial court should have denied Defendant relief because a reasonable basis does not exist to conclude that the admission of evidence of Officer Wright's alleged improprieties to impeach his testimony might have led to a different trial result. Specifically, the State argues that "nothing in the record suggests that [Officer Wright] unreasonably delayed in his efforts to obtain the defendant's blood, or that those blood test results were somehow compromised" and that the other evidence of Defendant's guilt presented at trial was overwhelming. Defendant, however, contends that the trial court should have granted coram nobis relief for all his convictions because the newly discovered evidence would have affected "the defense's entire litigation strategy" and might have resulted in a different outcome regarding all charges had it been presented during the pretrial hearings and at trial.

As previously stated, the writ of error coram nobis is an "*extraordinary* procedural remedy . . . into which few cases fall." *Mixon*, 983 S.W.2d at 672 (emphasis in original) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides:

The relief obtainable by this proceeding shall be confined to errors [outside] the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different result, had it been presented at the trial.

"The relief sought by a writ of error coram nobis is the setting aside of the conviction and the granting of a new trial." *Clardy v. State*, 691 S.W.3d 390, 400 (Tenn. 2024) (citing *Payne v. State*, 493 S.W.3d 478, 485 (Tenn. 2016)). The decision to grant or deny a coram nobis petition is within the discretion of the trial court. *Payne*, 493 S.W.3d at 484.

A petition for writ of error coram nobis must be pleaded with specificity. *Nunley v. State*, 552 S.W.3d 800, 829 (Tenn. 2018) (citations omitted). "Judges anticipate that the petition itself embodies the best case the petitioner has for relief from the challenged judgment. Thus, the fate of the petitioner's case rests on the ability of the petition to demonstrate that the petitioner is entitled to the extraordinary relief that the writ provides." *Id.* at 826 (quoting *Harris v. State*, 301 S.W.3d 141, 150 (Tenn. 2010) (Koch, J., concurring in part)). The petition must describe with particularity the nature and substance of the newly discovered evidence and demonstrate that the evidence qualifies as newly discovered. *Id.* at 816 (citation omitted). To be considered newly discovered, "'the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible.'" *Id.* (quoting *Payne*, 493 S.W.3d at 484-85). "The statute presupposes that the newly discovered evidence would be admissible at trial." *Id.* (citing *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012)). The trial court must be "reasonably well satisfied" with the veracity of the newly discovered evidence. *State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007).

The petitioner also must "'demonstrate with particularity . . . why the newly discovered evidence could not have been discovered in a more timely manner with the exercise of reasonable diligence; and . . . how the newly discovered evidence, had it been admitted at trial, may have resulted in a different judgment.'" *Payne*, 493 S.W.3d at 485 (quoting *Harris*, 301 S.W.3d at 152 (Koch, J., concurring in part)). "In considering a coram nobis petition, the trial court determines 'whether the new evidence may have led to a different result,' or in other words, 'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different.'" *Nunley*, 552 S.W.3d at 816 (quoting *Vasques*, 221 S.W.3d at 527).

The trial court found that the shared conclusion of Lieutenants Elrod and Jenkins that Officer Wright was untruthful during an internal SDPD investigation and Chief Sneed's "wrongly order[ing] at least one investigation closed as unfounded" would have been admissible as impeachment evidence at trial. The court found that this newly discovered evidence was credible and existed but had not yet been ascertained at the time of Defendant's trial. The court noted the State's concession that Defendant was not at fault in failing to discover the evidence prior to trial. Neither party challenges these findings on appeal. Rather, the arguments advanced by Defendant and the State on appeal relate to the impact of this newly discovered evidence on the trial proceedings.

The State argues because the trial court found the newly discovered evidence was only admissible for purposes of impeachment, such evidence does not warrant coram nobis relief. In *State v. Vasques*, our supreme court stated:

> [I]t is our further view that whether the testimony qualifies as impeachment evidence may be relevant in the determination but is not controlling. *Cf. State v. Sheffield*, 676 S.W.2d 542, 549 (Tenn. 1984); *State v. Arnold*, 719 S.W.2d 543, 550 (Tenn. Crim. App. 1986). Impeachment evidence might be particularly compelling under the circumstances of a particular case. Moreover, a complete restriction on the availability of coram nobis relief in the case of any newly discovered impeachment evidence would be inconsistent with the discretion afforded to our trial courts. Finally, the language of Tennessee Code Annotated section 40-26-105 makes no distinction between impeachment evidence and all other evidence.

*Vasques*, 221 S.W.3d at 528. Thus, we will consider the impact of this impeachment evidence on the pretrial and trial proceedings.

Defendant maintains that had the newly discovered impeachment evidence been provided prior to trial, he would have used the evidence to challenge the search warrant affidavit for the blood draw based on insufficient probable cause and pursuant to *Franks*, the admissibility of the BAC results due to the delay between the crash and the blood draw, and the admissibility of Dr. Ferslew's testimony. Defendant asserts that had the impeachment evidence been presented during these pretrial hearings, the trial court's pretrial rulings regarding the admissibility of the BAC results and Dr. Ferslew's testimony might have been different. As noted by the State, "[t]his court has repeatedly held that a petition for writ of coram nobis cannot be used to relitigate a suppression motion." *Hughes-Mabry v. Lee*, No. E2017-01652-CCA-R3-ECN, 2018 WL 1445984, at *4 (Tenn. Crim. App. Mar. 23, 2018) (first citing *Willis v. State*, No. E2015-00235-CCA-R3-ECN, 2016 WL 3753738, at *14 (Tenn. Crim. App. July 7, 2016); then *Jefferson v. State*, No. M2014-00756-CCA-R3-ECN, 2015 WL 2128606, at *8 (Tenn. Crim. App. May 6, 2015); and then

- 53 -

*Draper v. State*, No. E2009-00952-CCA-R3-PC, 2010 WL 5343193, at *5 (Tenn. Crim. App. Dec. 21, 2010)). Therefore, the trial court did not abuse its discretion in denying coram nobis relief on this basis.

Defendant asserts that there is a reasonable basis for concluding that the results of the trial might have been different had the newly discovered impeachment evidence been presented at trial. He argues he could have used the evidence to challenge Officer Wright's trial testimony regarding his observations of Defendant's appearance and conduct at the scene that were indicative of impairment. As noted by the trial court, however, portions of Officer Wright's testimony were "exculpatory in some respects," such as his observations of Defendant's conduct and speech at the scene, which were not indicative of impairment. Much of Officer Wright's trial testimony was supported by the video recording from his body camera and the video recording from the booking room at the police department. Officer Wright testified that he smelled the odor of an intoxicant in the area where Defendant was sitting in the patrol car. However, because both an officer and a member of emergency personnel also testified that they smelled alcohol on Defendant at the scene, the court found Officer Wright's observations "practically immune to impeachment at trial." Accordingly, there is not a reasonable basis for concluding that had the newly discovered impeachment evidence been presented at trial, the result of the proceedings might have been different. The trial court did not abuse its discretion in denying coram nobis relief on this basis.

The State challenges the trial court's grant of coram nobis relief based on the impact of the newly discovered impeachment evidence on the proof of the chain of custody of the blood sample. The court found that Officer Wright's testimony regarding the chain of custody of the blood sample was "uncorroborated" but that at trial the State satisfied the chain of custody for proper admission of the sample. Nevertheless, the court found that the admission of the newly discovered impeachment evidence "may have caused the jury to come to a different conclusion about the chain of custody's evidentiary weight." The court reasoned the admission of the newly discovered evidence might have affected Defendant's convictions for vehicular homicide by intoxication and DUI, "both of which relate to Defendant's BAC."

Yet, Defendant never alleged in his initial or amended petitions, during the multiple coram nobis hearings, or in his "supplemental brief" to the trial court that the newly discovered impeachment evidence might have impacted the jury's consideration of the chain of custody evidence. Although Defendant argued in his "supplemental brief" that the newly discovered impeachment evidence might have led the jury to question the reliability of the retrograde extrapolation, he did not otherwise link the testimony to the chain of custody. Our supreme court has held that a defendant must plead the allegations in a coram nobis petition "with particularity," including "how the newly discovered

evidence, had it been admitted at trial, may have resulted in a different judgment." *Payne*, 493 S.W.3d at 485 (quoting *Harris*, 301 S.W.3d at 152 (Koch, J. concurring in part). A coram nobis petition must be "as specific and certain as the nature of the error will permit." *Harris*, 301 S.W.3d at 150 (quoting *Memphis St. Ry. v. Johnson*, 88 S.W. 169, 171 (Tenn. 1905)). One of the purposes of the specificity requirement is to assure "that the trial court and the opposing party are informed precisely of the error or errors being relied upon." *Id.* at 150-51 (citations omitted).

Because Defendant failed to argue in the trial court that the newly discovered evidence affected the chain of custody, the State had no notice of the issue and was not given an opportunity to rebut or otherwise address it. Rather, the trial court granted coram nobis relief based on an issue that was not argued or otherwise raised by the parties. The United States Supreme Court has recognized that "[i]n our adversarial system of adjudication, we follow the principle of party presentation" whereby the parties "frame the issues for decision" and the court serves as a "neutral arbiter of matters the parties present." *Clark v. Sweeney*, 607 U.S. ___, ___ (2025) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). "To put it plainly, courts 'call balls and strikes'; they don't get a turn at bat." *Id.* (quoting *Lomax v. Ortiz-Marquez*, 590 U.S. ___, ___ (2020)).

Furthermore, the chain of custody of Defendant's blood sample was never called into question at trial. When Special Agent Bramlage testified, she did not indicate any impropriety in the blood same or any tampering with the blood kit or the vials' seals. Lastly, the other evidence of Defendant's intoxication presented at trial was strong. It included Mr. Taylor's testimony regarding the amount of bourbon that Defendant consumed on the night prior to the crash; Defendant's decision to drive approximately four and a half hours after he stopped drinking; his making a U-turn in the middle of the roadway, speeding down the wrong way while ignoring the lines and reflectors on the roadway indicating that he was going the wrong way, and swerving into the victim's lane and forcing the victim to the shoulder of the roadway before striking the victim's vehicle head on; the testimony of multiple witnesses who smelled alcohol on Defendant at the scene of the crash; Defendant's admission of drinking alcohol on the night prior to the crash; and his reported confusion regarding how he ended up driving on the wrong side of the road.

Based on Defendant's failure to raise the issue below, and the strength of the other evidence presented at trial to support Defendant's intoxication, we conclude that the trial court abused its discretion in determining that the newly discovered impeachment evidence might have resulted in a different judgment had the evidence been presented at trial as it relates to the chain of custody of the blood sample. Accordingly, we reverse the trial court's partial grant of coram nobis relief and reinstate Defendant's convictions for vehicular homicide by intoxication and DUI.

We note that at sentencing, the trial court merged all the convictions into the conviction for vehicular homicide by intoxication but did not impose separate sentences for each conviction. The trial court thereafter granted coram nobis relief in the form of a new trial for Defendant's convictions for vehicular homicide by intoxication and DUI and reversed its order merging Defendant's remaining convictions into the conviction for vehicular homicide by intoxication. As a result, Defendant was incarcerated for convictions for which he had not been sentenced. Trial courts should "impose a sentence on each count and reflect the sentence on the respective uniform judgment document." *State v. Berry*, 503 S.W.3d 360, 365 (Tenn. 2015). Therefore, we remand the case to the trial court for a sentencing hearing on Defendant's convictions of reckless driving, unlawfully driving on a divided highway, speeding, failure to exercise due care, DUI, and reckless vehicular homicide, and the entry of corrected judgments reflecting separate sentences for each conviction. Each conviction should be listed on a separate judgment form.

## Conclusion

Upon review, we conclude that the trial court abused its discretion in granting Defendant's petition for writ of error coram nobis in part, and we reverse the trial court's order and reinstate Defendant's convictions for vehicular homicide by intoxication and DUI. We also remand for sentencing and entry of corrected judgments as specified in this opinion. We otherwise affirm the judgments of the trial court.


_____
s/ Matthew J. Wilson
MATTHEW J. WILSON, JUDGE